**In the Matter of The NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.**

No. 30226.

United States District Court, D. Connecticut.

Feb. 14, 1980.

Supplemental Opinion on the Consensual Plan April 14, 1980.

would have been extended to April 7, 1980. Fed.R.App.P. 26(a).

James Wm. Moore, New Haven, Conn., and Joseph Auerbach and Morris Raker of Sullivan & Worcester, Boston, Mass., for Richard Joyce Smith, trustee.

Lawrence W. Iannotti and Irving S. Schloss of Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for Lawrence W. Iannotti, Successor Trustee under the Debtor's First and Refunding Mortgage.

Lester C. Migdal and Lawrence W. Pollack of Migdal, Tenney, Glass & Pollack, New York City, for Debtor's First Mortgage 4% Bondholders Committee.

Elaine S. Amendola, of Zeldes, Needle & Cooper, Bridgeport, Conn., for Jacob D. Zeldes, Successor Trustee under the Debtor's General Income Mortgage.

Alfred Berman of Guggenheimer & Untermyer, New York City, for Regina Gruss.

John A. Friedman of Kaye, Scholer, Fierman, Hays & Handler, New York City, for Reliance Group, Inc.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | HISTORY OF THE NEW HAVEN REORGANIZATION | 760 |
| II. | AMENDED PLAN OF REORGANIZATION OF THE NEW HAVEN | 767 |
|  | A. THE REORGANIZED COMPANY | 767 |
|  | B. CLASSIFICATION OF CLAIMS AND INTERESTS AND TREATMENT PROVIDED | 768 |
|  |     Class A Claims | 768 |
|  |     Class B Claims | 768 |
|  |     Class C and Class F Claims | 768 |
|  |     Class D Claims | 770 |
|  |     Class E Claims | 770 |
|  |     Class I and Class J Claims | 770 |
| III. | CLASS G AND CLASS H CLAIMS | 770 |
|  | A. THE PARTIES' VALUATION OF THE NEW HAVEN ESTATE | 772 |
|  |     The Trustee's Methodology | 773 |
|  |     The First Mortgage Bondholders' Methodology | 785 |
|  |     The Income Bondholders' Methodology | 789 |
|  | B. THE COURT'S RULINGS ON VALUATION | 790 |
|  |     Cash | 791 |
|  |     The Securities | 791 |
|  |     Intangibles | 796 |
|  | C. THE COURT'S RULINGS ON CLAIMS | 797 |
|  | D. DISTRIBUTION | 800 |
| IV. | RESERVATION OF JURISDICTION | 800 |

## MEMORANDUM OF DECISION

ZAMPANO, Senior District Judge.

On July 7, 1961, the New York, New Haven & Hartford Railroad Company ("New Haven") filed a petition for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205, in the United States District Court for the District of Connecticut. At the time the New Haven was a financially derailed and wrecked railroad. For the next 17 years, Chief Judge Robert P. Anderson, later Circuit Judge, painstakingly presided over the reorganization proceedings with extraordinary skill, patience, common sense, and perspicacity. The voluminous record discloses thousands of pages of petitions, briefs, moving papers, exhibits, transcripts of hearings, and other documents. Judge Anderson's numerous decisions and orders speak eloquently of his wise and effective judicial performance over the years in salvage efforts of the New Haven, with the result that it now emerges from the ruins with prospects of being a remarkably healthy enterprise of substantial value.

By May 1978, Judge Anderson had set in motion the procedural steps necessary to reorganize the New Haven and to terminate finally this complex and difficult case. Unfortunately, he died on May 2, 1978, and the matter was assigned to this Court for resolution.

## I. HISTORY OF THE NEW HAVEN REORGANIZATION

In 1935 the New Haven first went into reorganization under Section 77 of the Bankruptcy Act and emerged 12 years later with a capitalization in part of 1) $95,703,700 principal amount of series A first and refunding mortgage bonds due July 1, 2007, bearing interest at the rate of 4 percent per annum, and 2) $87,881,500 principal amount of general mortgage income series A bonds, due July 1, 2022, bearing contingent interest at the rate of 4½ percent per annum.[1] At the time, with some 1,500 miles of line extending from Boston to New York, it was

---

1. *New York, N. H. & H. R. R. Reorganization*, No. 10992 (I.C.C. Sept. 17, 1947) (Supplemental Report of the Commission).

the largest railroad in New England and the sixth largest in the Northeast region.[2]

After a few years of superficial prosperity, the financial condition of the New Haven again deteriorated. By 1961, with current liabilities exceeding current assets by over $36,000,000 and losing cash at the annual rate of $18,000,000, the company filed a petition for reorganization under Section 77.[3] Judge Anderson approved the petition and three trustees were appointed to administer the rapidly declining railroad.[4]

There were three possible courses of action for the parties: 1) seek termination of the operations of the transportation system and liquidation of the assets; 2) sell the bankrupt railroad to other profitable carriers; or 3) merge with a larger successful trunkline railroad.[5]

Since it was immediately apparent that no other railroad was interested in purchasing the debt-ridden New Haven, Judge Anderson gave careful and thoughtful consideration to the remaining options. Initially it appeared that "the value of the property in the estate of the Debtor as a going concern should exceed by far its value for purposes of liquidation," and, therefore, he approved continued operations for the public good and in the interests of creditors.[6] Through "life-sustaining transfusions of credit,"[7] the trustees maintained the system's passenger and freight lines.

Despite spartan economies and a sizeable reduction in the number of employees, staggering losses continued to mount and it soon became obvious that no reorganization plan that contemplated the New Haven as an independent operating business would be feasible.[8] Liquidation was deemed detrimental to the public interest[9] and, therefore, merger with a large, financially healthy railroad seemed to be the most logical and promising means of sustaining the New Haven's transportation system.[10]

When the Pennsylvania Railroad and the New York Central Railroad applied to the Interstate Commerce Commission for permission to merge on March 9, 1962, the New Haven trustees promptly sought inclusion in a merged Penn Central system, both by private negotiations and by a petition to the Commission filed June 26, 1962.[11] As noted by Judge Anderson, the "inclusion of the New Haven in the Penn Central merger was the only salvation for the New Haven as an operating railroad." *In re New York, N. H. & H. R. R.*, 289 F.Supp. 451, 456 (D.Conn.1968).

On April 6, 1966, after more than four years of deficit operations by the New Haven, the Commission approved the Penn Central merger, subject to the condition that the merged railroad would purchase essentially all of the assets of the New

2. *New Haven Inclusion Cases*, 399 U.S. 392, 401, 90 S.Ct. 2054, 2062, 26 L.Ed.2d 691 (1970).

3. *Id.*, at 403, 90 S.Ct. at 2063.

4. The trustees were Richard Joyce Smith, William J. Kirk and Harry W. Dorigan. Mr. Dorigan died in 1966; Mr. Kirk resigned in 1969 and died in 1979; Mr. Smith has served as the sole trustee since March 1, 1969.

5. *In re Penn Central Transportation Co.*, 458 F.Supp. 1234, 1248 (E.D.Pa.1978), aff'd in part, modified and rev'd in part 596 F.2d 1102; aff'd in part, 596 F.2d 1127; appeal dismissed in part, 596 F.2d 1155 (3 Cir.), cert. denied, 444 U.S. 835, 100 S.Ct. 68, 62 L.Ed.2d 45 (1979).

6. *In re New York, N. H. & H. R. R.*, No. 30226 (D.Conn. Dec. 31, 1961) (Order No. 25, authorizing the trustees to borrow money and issue certificates of indebtedness).

7. *Id.* (Mar. 5, 1962) (Order No. 81, authorizing trustees to lease new commuter cars from the Port of New York Authority).

8. *In re New York, N. H. & H. R. R.*, 281 F.Supp. 65, 66 (D.Conn.1968).

9. *In re New York, N. H. & H. R. R.*, 304 F.Supp. 793, 800 (D.Conn.1969), aff'd in part, vacated in part sub nom., *New Haven Inclusion Cases*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

10. *In re New York, N. H. & H. R. R.*, 479 F.2d 8, 10 (2 Cir. 1973); *In re New York, N. H. & H. R. R.*, 289 F.Supp. 451, 456 (D.Conn.1968).

11. *New Haven Inclusion Cases*, supra note 2, 399 U.S. at 408, 90 S.Ct. at 2066; *In re New York, N. H. & H. R. R.*, supra note 10, 479 F.2d at 10.

Haven.[12] In addition, the Commission directed that a plan for inclusion of the New Haven in the Penn Central system be filed by October 27, 1966, upon such fair and equitable terms and conditions as the Commission might determine, subject to the approval of the reorganization court.[13] On April 21, 1966, a Purchase Agreement was executed between the New Haven trustees and representatives of the merging railroads by which the Penn Central would acquire the properties of the New Haven for a consideration consisting of cash, Penn Central stocks and bonds, and the assumption of certain of the New Haven's obligations.[14]

In October 1966, the New Haven trustees filed with the Commission a "two-step" plan of reorganization which provided for 1) the New Haven's assets to be sold to the Penn Central, and 2) thereafter, a determination of fair and equitable terms for the treatment of security holders. Certain creditor interests litigated the expenditure of the assets of the New Haven to implement the plan and in 1967, the Second Circuit ruled that the merits of the two-step process should be postponed until the Commission certified a plan to the reorganization court.[15]

On November 19, 1967, after an independent review, the Commission concluded that $125 million was a fair and equitable price for the sale of the New Haven's assets under the Purchase Agreement.[16] This finding was promptly challenged by different classes of the New Haven's bondholders which on January 23, 1968, commenced a series of actions before a three-judge district court in the Southern District of New York to set aside the Commission's order.[17]

Shortly after the merger of the Pennsylvania and New York Central railroads on February 1, 1968, the Commission certified Step I of the reorganization plan for the New Haven—the sale of the New Haven's assets to Penn Central—to the reorganization court.[18] The New Haven bondholders, pursuant to Section 77(e) of the Bankruptcy Act, responded with objections to the plan and, thus, the identical question concerning the price Penn Central would have to pay the New Haven was the subject of judicial review simultaneously in the reorganization court in this District and the three-judge district court in New York. Subsequently, both courts determined that the Commission had substantially undervalued the New Haven's assets to be conveyed and remanded the issue to the Commission for further proceedings. *New York, N. H. & H. R. R., First Mortgage 4% Bondholders' Committee v. United States*, 289 F.Supp. 418 (S.D.N.Y. 1968); *In re New York, N. H. & H. R. R.*, supra, 289 F.Supp. at 466.

On remand, the Commission held further hearings in accordance with the instructions of the two reviewing courts. On December 2, 1968, it reported a revaluation of the New Haven's assets at $140 million and set January 1, 1969 as the date for the transfer of the New Haven's assets and operations to Penn Central. *Pennsylvania R. R.—Merger—New York Central R. R.*, 334 I.C.C. 25, 53, 74, 76 ("Fourth Supplemental Report").

During this period Judge Anderson recognized that the New Haven's desperate financial problems were causing an irreversible erosion of the estate and that continued expenses would soon reach the point of being an unconstitutional taking of the

---

**12.** *Pennsylvania R. R.—Merger—New York Central R. R.*, 327 I.C.C. 475, 524 (1966).

**13.** *Id.,* at 553.

**14.** *Iannotti v. Manufacturers Hanover Trust Co. (In re New York, N. H. & H. R. R.)*, 567 F.2d 166, 168–69 (2 Cir.), cert. denied, 434 U.S. 833, 98 S.Ct. 120, 54 L.Ed.2d 94 (1977).

**15.** *In re New York, N. H. & H. R. R.*, 378 F.2d 635 (2 Cir. 1967); see also *New Haven Inclu-*

sion *Cases*, supra note 2, 399 U.S. at 431, n.47, 90 S.Ct. at 2069, n.47.

**16.** *In re New York, N. H. & H. R. R.*, supra note 10, 479 F.2d at 11; see also *Pennsylvania R. R.—Merger—New York Central R. R.*, 331 I.C.C. 643 (1967).

**17.** *New Haven Inclusion Cases*, supra note 2, 399 U.S. at 413, 90 S.Ct. at 2069.

**18.** *Id.*

New Haven's assets without just compensation.[19] Accordingly, on December 24, 1968, he filed a memorandum of decision and order approving the transfer of the New Haven's assets to Penn Central as the "first step" in the New Haven's plan of reorganization. He instructed the trustees to carry out the conveyance and receive the consideration fixed by the Commission, subject to a general reservation of jurisdiction to review the plan of reorganization, including objections already filed as to the amount of such consideration. He further reiterated that "unless the transfer of the assets of the New Haven and the operation of the transportation system were taken over by the Penn Central by January 1, 1969, the trains of the New Haven would stop running." [20]

On December 31, 1968, the assets and operations were transferred to the Penn Central. At the time of the transfer the New Haven received from Penn Central 956,576 shares of Penn Central stock and about $63 million (cash, bonds and assumption and/or forgiveness of indebtedness) with the understanding that the total purchase price Penn Central was to pay remained for future judicial determination.[21]

Another round of litigation brought by objecting bondholders before the reorganization court and a three-judge district court in New York followed, wherein post-conveyance judicial review of the adequacy of the compensation was sought.

On May 28, 1969, the reorganization court entered its decision on Step I of the plan, *In re New York, N. H. & H. R. R.*, 304 F.Supp. 793 (D.Conn.1969), *aff'd in part, vacated in part sub nom., New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691

(1970), and in a separate opinion, filed July 28, 1969, it reviewed Step II of the plan, 304 F.Supp. 1121. The findings and rulings in both decisions were incorporated in a single order, dated July 28, 1969, 304 F.Supp. 1136 (D.Conn.1969), *aff'd in part, vacated in part sub nom., New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

In his *Step I Opinion,* Judge Anderson determined the Commission had erred in certain respects in its valuation of the New Haven's assets, and concluded that the price to be paid by Penn Central was approximately $175 million. Moreover, he structured an "underwriting" plan designed to ensure that the New Haven would receive the value of $87.50 per share of Penn Central's common stock, the intrinsic value ascribed to the shares by the Commission, 304 F.Supp. at 809.

In his *Step II Opinion,* Judge Anderson addressed the distributive elements of the plan of reorganization. This opinion is, of course, highly significant as precedent because many of the same and/or related issues are now pending before this Court for decision. Appellate review of the plan of reorganization to date, culminating in the *New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), primarily concerned Step I of the plan.[22]

On June 18, 1969, the three-judge court entered its opinion on the appropriate compensation to be paid by Penn Central to the New Haven. Although it agreed with Judge Anderson on the need for the "underwriting," it disagreed with his valuation of the assets by over $28 million, and, in effect, sustained the Commission's price determinations.[23]

---

19. *In re New York, N. H. & H. R. R.,* supra note 9, 304 F.Supp. at 796.

20. *Id.;* see also *In re New York, N. H. & H. R. R.,* No. 30226 (D.Conn. Dec. 24, 1968) (Memorandum of Decision on Inclusion and Payment by January 1, 1969; Order No. 559, directing inclusion of debtor in Penn Central Company).

21. *In re New York, N. H. & H. R. R.,* 330 F.Supp. 131, 139–40 (D.Conn.1971), rev'd on other grounds, 457 F.2d 683 (2 Cir. 1972), cert.

denied, *Smith v. Baker,* 409 U.S. 890, 93 S.Ct. 106, 34 L.Ed.2d 147 (1973).

22. Step II is further discussed in other sections of this opinion.

23. *New York, N. H. & H. R. R., First Mortgage 4% Bondholders' Committee v. United States,* 305 F.Supp. 1049 (S.D.N.Y.1969) (Weinfeld, J., dissenting in part), vacated sub nom. *New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

The conflicting decisions of the two district courts were then reviewed by the Supreme Court in expedited proceedings.[24] In the *New Haven Inclusion Cases,* supra, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691, the Supreme Court held that the reorganization court, as distinguished from the three-judge court, had primary jurisdiction over the pricing question, and affirmed Judge Anderson's evaluation of the New Haven's assets. This, however, did not terminate the issue. Eight days before the Supreme Court's decision, the Penn Central filed a petition for reorganization under Section 77 of the Bankruptcy Act in the United States District Court for the Eastern District of Pennsylvania. Recognizing that Penn Central's bankruptcy would substantially reduce the value of its securities, the Supreme Court decided that a remand for "[f]urther proceedings before the Commission and the appropriate federal courts [was] necessary to determine the form that Penn Central's consideration to [the] New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central." *Id.* at 489, 90 S.Ct. at 2108.

On remand, in the light of Penn Central's bankruptcy and in order fully to compensate and secure the New Haven estate for the balance remaining due, Judge Anderson sought to give the New Haven a secured-creditor status by declaring an equitable lien on all the assets transferred by the New Haven to Penn Central, and imposing a constructive trust on the New Haven's share of the income from the Grand Central properties.[25] On appeal, the Second Circuit reversed on jurisdictional grounds and remanded the case directly to the Commission.[26] Later in the Penn Central reorgani-

zation proceedings, for the purpose of clarifying the status of the New Haven as a participant in that case, Judge Fullam concluded that the New Haven estate should be treated tentatively as holding "a lien, indeterminate in amount, and indeterminate as to priority, upon all the real property and readily identifiable tangible personal property (exclusive of rolling stock) conveyed to Penn Central." [27]

Thereafter, the reorganization of the New Haven was largely entwined with the complex, unique and lengthy reorganization of the Penn Central. The New Haven trustee had asserted a secured claim in the total amount of $208.5 million for the unpaid principal and interest, arising from the inclusion in 1968 of the New Haven in the Penn Central merger.

The collapse of the mighty Penn Central precipitated a "rail transportation crisis seriously threatening the national welfare." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 108, 95 S.Ct. 335, 341, 42 L.Ed.2d 320 (1974). It soon became evident that a successful reorganization of Penn Central could not be accomplished wholly within the means provided by Section 77 of the Bankruptcy Act and that congressional intervention was necessary.[28] Congress responded to the crisis with the enactment of the Regional Rail Reorganization Act of 1973 (RRRA), which became law on January 2, 1974.[29] On December 16, 1974, the Supreme Court sustained the Act against constitutional challenge.[30] The purpose and effect of the RRRA have been succinctly stated by Judge Fullam as follows:

> The broad outline of the RRRA is relatively straightforward. The bankrupts would operate under the aegis of the

---

24. *In re New York, N. H. & H. R. R.,* supra note 10, 479 F.2d at 11.

25. *In re New York, N. H. & H. R. R.,* supra note 21, 330 F.Supp. at 142.

26. *In re New York, N. H. & H. R. R.,* 457 F.2d 683, 691 (2 Cir. 1972) (Mansfield, J. concurring and dissenting), cert. denied, *Smith v. Baker,* 409 U.S. 890, 93 S.Ct. 106, 34 L.Ed.2d 147 (1973).

27. *In re Penn Central Transportation Co.,* 337 F.Supp. 779, 791 (E.D.Pa.1971), cert. denied *Smith v. Baker,* 409 U.S. 1012, 93 S.Ct. 438, 34 L.Ed.2d 306 (1972).

28. *In re Penn Central Transportation Co.,* 596 F.2d 1127, 1133 (3 Cir. 1979).

29. 45 U.S.C. § 701, et seq.

30. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

Reorganization Courts for a further period, approximately 20 months, during which time the United States Railway Association (USRA), a new corporate entity created under the Act, could complete the task of planning the new rail system or systems, and deciding what portions of the Northeast bankrupts' rail facilities should be conveyed to Consolidated Rail Corporation (ConRail), the company which was to take over the system which USRA designed. The statute contemplates a system which, while not profitable immediately, would ultimately be a profitable private sector carrier. In return for the properties conveyed to ConRail, the bankrupts were to receive common stock and other securities of ConRail in amounts commensurate with the value of the properties conveyed. The Act also created the Special Court, a three-judge panel selected by the Judicial Panel on Multidistrict Litigation, to rule on the adequacy of USRA's valuation of the conveyed property and the value of the stock of ConRail which was given in return.

*In re Penn Central Transportation Co.,* 458 F.Supp. 1234, 1252 (E.D.Pa.1978), *aff'd in part, modified and rev'd in part,* 596 F.2d 1102; *aff'd in part,* 596 F.2d 1127; *appeal dismissed in part,* 596 F.2d 1155 (3 Cir.), cert. denied, 444 U.S. 835, 100 S.Ct. 68, 62 L.Ed.2d 45 (1979).

On April 1, 1976, certain of Penn Central's rail properties were conveyed to ConRail. Litigation, commonly referred to as the "Valuation Case," followed, with the focus primarily directed to 1) the "net liquidation value" of the Penn Central properties conveyed to ConRail, and 2) the "compensable unconstitutional erosion if any," suffered during the pre-conveyance period. See *In re Valuation Proceedings,* 439 F.Supp. 1351 (Sp.Ct.R.R.R.A.1977) (*Erosion Opinion*) and 445 F.Supp. 994 (Sp.Ct.R.R.R.A.1977) (*Valuation Opinion*). The main purpose of these two opinions rendered by the Special Court is to establish guidelines for the parties and the trial masters on the valuation issues. The eventual outcome of the Valuation Case may have a direct and significant effect on the payment of the debt securities issued by the reorganized Penn Central.[31]

The next sequence of relevant events involved efforts to formulate a fair and equitable plan of reorganization of the Penn Central. As summarized by Judge Aldisert:

> These efforts were focused on an attempt to construct a plan that would take account of (1) the income-producing continuing businesses owned and managed by Pennco; (2) the cash to be generated through liquidation of non-essential remaining assets (the "asset disposition program"); and (3) the constitutionally assured expectation that a significant award would be made in the Valuation Case, understanding all the while that both the time and the amount of the award were unforeseeable. The alternative to such a plan, it was believed, would be to embark on decades of litigation, with the concomitant waste of valuable and productive assets and accrual of increasing claims. Any plan, in order to be fair and equitable to the competing claims against the estate, would also have to take into account a basic reality of this reorganization proceeding: that the validity, priority or amount of virtually every claim was under attack in one way or another.

*In re Penn Central Transportation Co.,* 596 F.2d 1127, 1136 (3 Cir. 1979).

In the fall of 1975 the Penn Central trustees commenced a series of meetings with creditor interests to work out a consensual plan of reorganization, based necessarily on compromises of the many and varied claims in dispute. The assets remaining after conveyance to ConRail fell into two principal categories: 1) Penn Central's ongoing, successfully operating, non-railroad business, primarily consolidated in the Pennsylvania

---

**31.** *In re Penn Central Transportation Co.,* supra note 5, 458 F.Supp. at 1270–76.

Company ("Pennco"); and 2) a variety of real estate holdings and investments.[32]

During the following year, settlement proposals were agreed upon by virtually all of the Penn Central major creditors, including the United States, the so-called "Friday Group" (composed of representatives of a group of insurance companies known as the Institutional Investors Group, the New Haven trustee, and a group of banks represented by Citibank), numerous state and local taxing authorities, active unsecured creditors, Penn Central Company (the sole stockholder of Penn Central), and 15 leased lines also in reorganization known as the "secondary debtors."[33]

On December 17, 1976, the Penn Central trustees filed a plan of reorganization which embodied the agreement reached on December 14, 1976, between the New Haven trustee and the Chairman of the Penn Central trustees. The settlement proposed in the Penn Central plan treated the unpaid balance of the amount to be paid for the New Haven assets transferred on December 31, 1968, as a debt obligation of the reorganized Penn Central to be secured in the amount of $121 million (the unpaid principal amount) and unsecured in the amount of $53 million (a portion of the interest claimed).[34] All securities previously received from Penn Central and then held by the New Haven were to be cancelled. The total sum of $174 million was in addition to the items of consideration (cash, assumption of liabilities, and cancellation of indebtedness) previously paid or credited under the inclusion agreement and which aggregated approximately $53 million.

Inasmuch as all powers and duties of the ICC under Section 77 of the Bankruptcy Act with respect to the New Haven reorganization terminated as of February 5, 1976, at which time all such powers and duties became vested in the New Haven Reorganization Court by operation of § 618(b) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, February 5, 1976, the New Haven trustee petitioned the Court on January 7, 1977, for authority to settle the New Haven claim against Penn Central Transportation Company on the terms embodied in the Penn Central reorganization plan. A hearing on the petition was held on January 19, 1977, and by Order No. 821, dated March 30, 1977, the New Haven trustee was authorized "to take all such action which he consider[ed] necessary or appropriate in support of the proposed settlement and Plan of Reorganization."

After full and lengthy hearings, Judge Fullam approved a plan of reorganization for the Penn Central on March 17, 1978, specifically noting that the New Haven compromise was "fair and reasonable" and "well within the range of reasonably likely litigation possibilities." *In re Penn Central Transportation Co.*, supra, 458 F.Supp. at 1270.

On May 1, 1978, the day before his death, Judge Anderson issued Order No. 850 authorizing the New Haven trustee to vote in favor of the Penn Central Plan. This order constituted the final judicial step regarding approval of Step I of the New Haven plan of reorganization.

The Penn Central Plan was consummated on October 24, 1978, and the New Haven trustee received the cash and securities to which the New Haven estate was entitled: $12.8 million in cash; $28.8 million principal amount of Penn Central Series A Bonds; $7.5 million principal amount of Penn Central Series B Bonds; 1,815,000 shares of Penn Central Series B Preference Stock having a redemption value of $36.3 million; $15.9 million principal amount of Penn Central Certificates of Beneficial Interest ("CBI") and 1,370,203 shares of Penn Central Common Stock (representing about 6% of the total shares of Common Stock outstanding).

32. *Id.* at 1254–55.

33. *In re Penn Central Transportation Co.*, supra note 28, 596 F.2d at 1139.

34. *Id.*, at 1138.

Prior to the receipt of the compensation from the Penn Central, the New Haven trustee had filed Amendment No. 4 to the plan of reorganization of the New Haven ("Amended Plan") on April 18, 1978, primarily directed toward Step II, which had been held in abeyance pending a determination of New Haven's interest in the reorganized Penn Central. Hearings on Step II were conducted by this Court commencing on October 12, 1978, and continuing through July 12, 1979. Following the submission of briefs, final oral arguments were heard during the week of November 19, 1979.

## II. AMENDED PLAN OF REORGANIZATION OF THE NEW HAVEN

As noted previously, definitive rulings with respect to the treatment to be accorded security holders under Step II of the plan of reorganization were held in abeyance pending the final determinations of the Step I issues. Those determinations have been made and the consideration due the New Haven from Penn Central has been paid. This Court, therefore, now addresses the distributive elements of the plan, incorporated in the trustee's Amendment No. 4, filed on April 18, 1978.[35] This necessarily includes consideration of the distributive elements of the plans submitted by the other parties in this proceeding.

In deciding whether the provisions of the Amended Plan are fair and equitable, the Court will discuss *seriatim* the major features of the plan as set forth by the trustee, together with the objections, if any, of the parties, and rule thereon.

### A. THE REORGANIZED COMPANY

At the present time, the New Haven possesses only cash and Penn Central securities. The Amended Plan contemplates that the New Haven will be reorganized to carry on business as a closed-end, non-diversified management investment company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a–1, *et seq.*, with an authorized equity capitalization consisting of 7,700,000 shares of Class A Common Stock and 20,000,000 shares of New Common Stock of which the maximum number to be issued in consummation of the Amended Plan will be approximately 7,700,-000 and 6,600,000, respectively. There is no provision for any long-term or short-term debt to be outstanding at the consummation date except for Notes [36] and such debt as may be incurred in consummation of the Plan in accordance with its terms.

On the consummation date of the Amended Plan, the assets of the estate will be transferred to the reorganized company which, in turn, will distribute cash and its securities in full satisfaction of all claims allowed against the New Haven estate, in accordance with the provisions of the approved Amended Plan. The transfer will effect a discharge of all claims against the New Haven, except as otherwise provided in the order confirming the Amended Plan.

A reorganized New Haven has obvious merit particularly in view of the substantial tax advantages and growth potential of a new company. The parties to these proceedings recognize that the gains to be derived from a reorganization of the New Haven far exceed the values for distribution under an immediate and straight liquidation and, therefore, have offered no objection to this aspect of the trustee's Amended Plan.

Under these circumstances, the Court approves the concept that the New Haven should continue as a reorganized company, subject to the changes in the nature of the capital structure required to comply with the Court's rulings *infra*. Whether the reorganized company will be formed by the

---

**35.** The Amended Plan is a composite plan of reorganization reflecting the trustee's plan of reorganization dated October 27, 1966, as amended by Amendment No. 1 dated May 11, 1967, as amended by Amendment No. 2 dated September 12, 1967, as amended by Amendment No. 3 dated December 29, 1967, and as amended by Amendment No. 4 dated April 18, 1978 ("Amended Plan").

**36.** Inasmuch as the Court is ordering payments in cash for all of the claimants for whom the Amended Plan provided partial payment in Notes, the provisions for Notes should be deleted.

organization of a new corporation,[37] or by suitable changes in the corporate papers of the present New Haven corporation, is left for future determination by this Court. In either event, the Court will appoint the Board of Directors of the reorganized company after considering suggestions from interested persons.

## B. CLASSIFICATION OF CLAIMS AND INTERESTS AND TREATMENT PROVIDED

Under the Amended Plan, the claims against the New Haven are divided into ten classes: Classes A through E represent post-bankruptcy or administration claims; Classes F through J represent pre-bankruptcy claims. Classes G and H are discussed in part III of this opinion.

### Class A Claims

These claims consist of the costs and expenses incurred and to be incurred in connection with the New Haven reorganization proceedings. They include compensation

under Section 77(c)(2) (compensation for the trustee, his general counsel, and his special counsel), and under Section 77(c)(12) (compensation for representatives of creditor interests).[38] The reserve of $5 million set aside by the trustee for these claims is adequate for their payment in cash by the reorganized company to the extent not paid by the trustee prior to the consummation date.

### Class B Claims

These claims were the sums due the United States as the holder of Trustees' Certificates which were extinguished by the payments in full on November 8, 1978 and March 30, 1979, respectively, of $6.25 million unpaid principal and $281,378 unpaid accrued interest. The provisions of the Amended Plan with respect to Class B claims, therefore should be deleted.

### Class C and Class F Claims

These classes refer to the claims of state and local authorities for taxes and related

---

**37.** In anticipation that this element of the Amended Plan would be acceptable to the parties and the Court, the trustee formed a new company, the "New Haven Corporation," under the laws of the State of Delaware on July 17, 1978.

**38.** Petitions have been filed on behalf of the trustee, his general counsel, and certain of his special counsel for final compensation under Section 77(c)(2) and are awaiting hearings to be scheduled in the future.

The trustee requests $1,740,000, less the total amount of interim fees received by him up to December 31, 1978, and further asks that his final allowance for the period commencing January 1, 1979 and ending with his discharge, be fixed at $10,000 per month, less the monthly interim fee allowed and paid to him during that period. Between August 3, 1961 and November 30, 1979, Mr. Smith received the sum of $943,180.00.

On behalf of the Estate of William J. Kirk, a former co-trustee (see note 4, supra), Mr. Smith requests that a final fee of $300,000 be allowed in addition to the interim fees received by Mr. Kirk.

General counsel applies for an award ranging between $340,000 and $680,000 for the period ending August 3, 1978.

The firm of Sullivan and Worcester, special counsel to the trustee, seeks $1,924,272 in addition to interim compensation paid or to be paid. Between August 26, 1961 and December 13,

1979 this firm has been paid the sum of $4,697,-478.50. The trustee has filed a Section 77(c)(12) petition in the Penn Central reorganization court seeking reimbursement of $2,150,-000 for legal expenses incurred by the New Haven which greatly benefited the reorganization of the Penn Central.

The firm of Gratz, Tate, Spiegel, Ervin & Ruthrauff has also filed a petition for final allowance as special counsel to the trustee in the total amount of $98,861. This, too, is in addition to the fees already allowed for services rendered to the New Haven.

On May 25, 1979, petitions were heard and are currently *sub judice* with respect to the payment of contingent fees awarded by Judge Anderson, *In re New York, N. H. & H. R. R.,* 421 F.Supp. 249, 267, 272 (D.Conn.1976), aff'd sub nom. *Iannotti v. Manufacturers Hanover Trust Co.,* 567 F.2d 166 (2 Cir.), cert. denied, 434 U.S. 833, 98 S.Ct. 120, 54 L.Ed.2d 94 (1977), to the firm of Migdal, Tenney, Glass & Pollack, counsel for the First Mortgage 4% Bondholders' Committee, to Manufacturers Hanover Trust Company for itself and for and on account of the services of its attorneys Simpson Thacher and Bartlett, and to Chase Manhattan Bank N. A., for and on account of the services of its attorneys Dewey, Ballantine, Bushby, Palmer & Wood. These contingent claims aggregate approximately $1,400,000.

charges. Class C is applicable to the post-bankruptcy period commencing July 7, 1961; Class F relates to the pre-bankruptcy accumulation of taxes and other charges. Section V of the Amended Plan states in pertinent part:

> 5.3 Class C: These claims will be treated as being equal to their principal amount, without penalties or interest, and will be paid in cash on the Consummation Date to the extent of 50% (together with such additional amount, if any, as will facilitate the issuance of Notes in authorized denominations) and by the issuance and delivery of Notes in a principal amount equal to the balance of the claims.

> .  .  .  .  .

> 5.6 Class F: These claims (exclusive of penalties or post-bankruptcy interest) including interest accrued for the Pre-Bankruptcy Period will be treated in the same manner as Class C claims.

At the time the Amended Plan was filed, the controversy over the computation and payment of the tax claims loomed as a major source of complex and lengthy litigation. Second only in amount to the total claims of the two system mortgages, the tax claims as listed on the books of the New Haven represented a potential liability of over $13 million due 347 taxing authorities. The major claimants, led by the State of New York, asserted that post-bankruptcy interest should be paid on all tax claims and that tax claims, as "administration claims," must be paid in full and in cash upon consummation of the plan. If valid, these contentions would have entitled local taxing authorities from the State of New York alone, with the principal amount of their tax claims at $5 million, to obtain an additional sum of over $8 million in interest.

For reasons stated hereinafter, no useful purpose will be served by reviewing the myriad legal arguments advanced by the tax claimants or the responses submitted by the trustee and other parties opposed to the tax claimants' position.[39] Events occurring subsequent to April 1978 have rendered these issues academic because no tax claimant now remains that has legal standing to demand more than the principal amount of its claim.

Concurring with Judge Anderson's observation ten years ago that "it may well be to the mutual advantage of [the] tax claimants and the estate to negotiate settlements," 304 F.Supp. at 1129, and in an effort to narrow the number of litigable issues in these proceedings, this Court determined that as many as possible of the tax claimants' disputes with the New Haven should be settled. Accordingly, in June 1978, the Court directed that a vigorous program be commenced to reduce the number and dollar amount of the tax claims. From that time on and continuing to date, negotiations with tax claimants, on a case by case basis, have been in progress with extraordinary success. The overwhelming majority of the tax claims and related charges, including those made by the City of New York, State of New York, and the City of Providence, have been resolved by payments ranging from 50% to 100% of their respective principal amounts. No interest or penalty has been allowed or paid on these claims.

Under these circumstances, settlement efforts with the remaining tax claimants should continue up to the consummation date of the plan. Those tax claims which are unresolved on the consummation date will be treated as being equal to their principal amount, without penalties or interest,

---

**39.** The Court overrules the Income Bondholders trustee's objection to payment of the remaining tax claimants in cash. He urges that the Class C and Class F claims be treated as set forth in the Amended Plan, i. e., 50% of the principal amount due on Consummation Date in cash, and the balance by the issuance of notes, maturing in installments over a period of up to four years following Consummation Date. The main reason advanced in support of the objection is that the New Haven should preserve as much of its cash reserves as possible to maximize the values in the estate. However, the Court agrees with the New Haven trustee's position that the present cash position of the New Haven, well in excess of $35 million, is more than sufficient to pay the remaining tax claims (less than $3 million) in cash without possible prejudice to the rights of other creditors or the financial status of the estate.

and will be paid in full in cash on the consummation date.

Paragraphs 5.3 and 5.6 of Section V of the Amended Plan should be amended accordingly.

### Class D Claims

These claims arise from the New Haven's liability for personal injury and wrongful death cases. Very few are still pending, and the present reserve of $400,000 appears adequate to cover immediate payments in cash of amounts determined by adjudication or settlement up to the consummation date. Any claim that has not been so adjudicated, determined or settled prior to the consummation date will be assumed by the reorganized company and thereafter paid in cash pursuant to an order of this Court when such claim has been adjudicated or determined.

Paragraph 5.4 of Section V of the Amended Plan should be amended to conform to this ruling.

### Class E Claims

These claims are those not already specified in Classes A through D but which are found by the Court to be entitled to be treated as administration claims. The total exposure for Class E claims is approximately $1 million [40] and, therefore, when adjudicated or settled, they should be paid in full in cash.

Paragraph 5.5 of Section V of the Amended Plan should be amended accordingly.

### Class I and Class J Claims

The New Haven estate is so insolvent that the general unsecured claims, designated as Class I, and the stockholders' interests, designated as Class J, have no equity and these unsecured, pre-reorganization claims take nothing under the Amended Plan.

---

**40.** Certain consignees of perishable goods have filed a claim for freight loss and damage during a period prior to December 31, 1968, in the amount of $610,000. The trustee disputes the claim.

### III. CLASS G AND CLASS H CLAIMS

Class G claims are those of the First Mortgage Bondholders, whose bonds were issued under and secured by the lien of the New Haven's First and Refunding Mortgage, dated July 1, 1947, maturing July 1, 2007, and bearing interest at the rate of 4% per annum. Class H claims are those of the Income Mortgage Bondholders, whose bonds were issued under and secured by the lien of the New Haven's General Income Mortgage, dated July 1, 1947, maturing July 1, 2022, and bearing interest at the rate of 4½% per annum.

The First Mortgage Bonds and Income Bonds themselves were originally reorganization securities, issued when the New Haven emerged from an earlier Section 77 bankruptcy proceeding in 1947. In contrast to liens in connection with specific acquisitions, these bonds are system mortgages, secured by all the New Haven's assets. It is uncontroverted that the lien of the Income Bonds is in all respects junior to the lien, on the same assets, of the First Mortgage Bonds. Thus, the First Mortgage Bondholders must receive full compensation for the amount allowed of their claim, and thereafter the Income Bondholders receive payment of their claim, but only to the extent that the assets of the New Haven estate exceed the senior claim. If nothing remains after the payment to the first system bondholders, the second system bondholders take nothing. If there is a surplus of assets, the Income Bondholders participate in the plan of reorganization and are secured in such amount, beyond which they are unsecured and are entitled to no payment.

Under the Amended Plan, the trustee computes the First Mortgage Bondholders' allowable claim as follows: $76,819,900 as the principal amount due, with accrual of simple interest at the contract rate of 4%

---

Other claims now pending, all of which are in contest, total $342,593.

per annum until the effective date of the plan, i. e., the date on which the Court enters an order approving a plan of reorganization for the New Haven.[41] This interest now approximates $58,895,251. Thus, the trustee recognizes the total claim in Class G to be about $135.7 million.[42]

The claims in Class H are fixed in the Amended Plan in the aggregate amount of $59,877,493, with no further accrual of interest.

In light of his estimated reorganization value for the New Haven of between $120 million and $150 million, and his estimated equity value for the reorganized New Haven of approximately $140 million, the trustee proposes that a fair and equitable distribution of the securities of the reorganized New Haven as between the two system bondholders is as follows:

1) 7,681,990 shares of the preferred convertible Class A Common Stock, representing one share for each $10 of principal, to the holders of First Mortgage Bonds, in satisfaction of the principal amount of their claim.

2) 5,889,525 shares of the New Common Stock representing one share for each $10 of interest, to the holders of First Mortgage Bonds, in satisfaction of the interest accrued to the effective date of the plan, i. e., February 14, 1980.

3) 1,055,110 shares of New Common Stock to holders of Income Bonds, in satisfaction of the allowable portion of their claim for principal and accrued interest to 1960.

In practical effect, assuming full conversion of Class A Common into New Common,

the relative distribution of equity in the reorganized company under the Amended Plan is 93.1% to the First Mortgage Bondholders and 6.9% to the Income Bondholders.

Both the First Mortgage Bondholders[43] and the Income Bondholders strenuously oppose these features of the Amended Plan, and have submitted their own proposals for the Court's consideration. As might be expected, each of their plans—based on divergent factual and legal approaches to the issues concerning the valuation of the assets of the New Haven and the calculation of the allowable portion of their respective claims—differs significantly with respect to the proper distribution of the securities of the reorganized New Haven vis-a-vis the two system mortgages.

In sum, the First Mortgage Bondholders argue that: 1) the net asset value of the New Haven estate is less than $76 million; 2) their total claim, including interest running to the consummation date rather than the effective date of the approved plan of reorganization, is in excess of $130 million; 3) the Court, therefore, must conclude there is no equity whatever for the Income Bondholders; and 4) there should be a single class of equity security in the reorganized New Haven, all of which should be distributed to the holders of the First Mortgage Bonds.

The Income Bondholders, on the other hand, contend that 1) the New Haven's reorganization value is in the range of $174.5 million to $245.8 million; 2) the allowable claim of the First Mortgage Bondholders for principal and interest should be

---

41. As filed on April 18, 1978, the trustee's Amended Plan provided for accrual of simple interest on the First Mortgage Bonds, at the contract rate of 4%, to September 30, 1978, his estimate of a possible effective date of the Amended Plan.

42. At the contract rate of 4%, simple interest on the principal amount of the claim of the First Mortgage Bondholders accrues in the amount of $256,066 per month. Such an accrual of interest would require the issuance to the

bondholders of 25,606.6 shares of New Common Stock of the reorganized company for each month between October 1, 1978 and the last day of the month in which the effective date occurs.

43. The "First Mortgage Bondholders" should be understood to mean the Successor Trustee under the Debtor's First and Refunding Mortgage and the First Mortgage 4% Bondholders' Committee.

fixed at $101,154,737; 3) the Income Mortgage Bondholders' claim aggregates $79,-832,047 of principal and interest; 4) with certain limitations on redemption rights, all the Class A Common Stock (approximately 10.1 million shares of the reorganized New Haven) should issue to the First Mortgage Bondholders, *pro rata*, on the basis of 100 shares for each $1,000 of principal and 100 shares for each $1,000 of interest, in full satisfaction of their claims; 5) all the New Common Stock (approximately 7.9 million shares) should issue to the Income Mortgage Bondholders, *pro rata*, on the basis of 100 shares for each $1,000 of principal and 100 shares for each $1,000 of interest; 6) until the conclusion of the Valuation Case, the reorganized New Haven's holdings of Penn Central's Common Stock and CBI must be retained; and 7) the reorganized New Haven cannot be voluntarily dissolved or liquidated, except with the prior approval of the holders of at least 60% of the outstanding shares of Class A Common Stock and New Common Stock.

These competing and conflicting proposals advanced by the trustee and the two system bondholders fashion the major legal and factual questions presented for rulings in these proceedings.

■ Under Section 77(e) of the Bankruptcy Act, the primary duty of the Court is to approve a legal plan of reorganization of the New Haven which is fair and equitable, and affords due recognition to the rights of each class of creditors. See, e. g., *Group of Institutional Investors v. Chicago, M., St. P. & P. R. R.*, 318 U.S. 523, 539–40, 63 S.Ct. 727, 737–38, 87 L.Ed. 959 (1943) (*"Institutional Investors"*); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 114, 60 S.Ct. 1, 6, 84 L.Ed. 110 (1939); *In re Penn Central Transportation Co.*, 596 F.2d 1155, 1164 (3 Cir.), cert. denied, 444 U.S. 835, 100 S.Ct. 68, 62 L.Ed.2d 45 (1979).

■ An application of those standards in the context of the present proceedings requires the Court to 1) value the New Haven estate; 2) determine the allowable claims against the estate; and 3) establish the treatment to be accorded these claims under the plan to ensure that creditors will receive full and equitable compensation in exchange for their prior claims. *Institutional Investors*, supra, 318 U.S. at 566, 63 S.Ct. at 749; *Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510, 529–30, 61 S.Ct. 675, 686–87, 85 L.Ed. 982 (1941) (*"Consolidated Rock"*); *In re Penn Central Transportation Co.*, 596 F.2d 1102, 1110 (3 Cir. 1979); see also *Tr. Brief* at 22; *FB Brief* at 13, 26; *IB Brief* at 14.[44]

### A. THE PARTIES' VALUATION OF THE NEW HAVEN ESTATE

A valuation of the assets of the New Haven is a necessary prerequisite to the design of a fair and equitable plan of reorganization for the enterprise. Once that valuation is ascertained, it is then translated into a new set of securities of the reorganized New Haven which, in turn, is distributed to creditors in accordance with the absolute priority rule. As *Collier* explains:

If the court is to pass upon the proposed distribution of the debtor's assets, the classes of creditors and stockholders to be granted participation, the allocation of new securities or other compensation, the allocation of voting control, and the like, as well as upon the soundness of the proposed capital structure of the rehabilitated enterprise with regard to its ability to meet future charges and to furnish an adequate return to creditors, the court obviously must have before it a complete and reliable evaluation of the debtor's assets. Absent the requisite valuation data, the court is in no position to exer-

44. Citations to the briefs of the parties with respect to the Amended Plan will be abbreviated as follows: the trustee's brief and reply brief will be *Tr. Brief* and *Tr. Reply Brief*, respective- ly; the briefs of the First Mortgage Bondholders will be *FB Brief* and *FB Reply Brief*; and the briefs of the Income Bondholders will be *IB Brief* and *IB Reply Brief*.

cise the informed judgment required of it in assessing the fairness, equity and feasibility of a plan, either upon approval or confirmation thereof.

6A *Collier on Bankruptcy*, ¶ 11.05 at 184–85 (1977); see also *Consolidated Rock*, supra, 312 U.S. at 524, 61 S.Ct. at 684 (a determination of the value of the debtor's assets is required so that criteria will be available to determine an appropriate allocation of new securities between bondholders and stockholders).

The main controversy in this case focuses on the proper methodology to be applied by the Court in valuing the assets of the New Haven, which consist solely of cash and Penn Central securities. The parties urge acceptance of the valuation procedures for the securities which best conform to their views of the applicable law and which, coincidentally, establish the most favorable standing with respect to their own cause. In support of their positions, the parties have submitted considerable evidence by way of affidavits, expert testimony, exhibits, moving papers, and briefs. Each of the varied and conflicting opinions of the experts was the subject of extensive and, at times, exhaustive cross-examination; hardly a material representation on valuation submitted by one party went unchallenged by another party. The voluminous record in the proceedings speaks eloquently of the tireless efforts of counsel on behalf of their clients.

### The Trustee's Methodology

The trustee contends that, for reorganization purposes, the Court is required to measure the worth of the New Haven by evaluating its earning power as a going concern. Under this methodology, the securities held by the New Haven must be appraised by estimating their "intrinsic" or "reorganization" value, rather than by reference to their current market value. He finds support for his position in the rulings of leading cases involving the reorganization of debtors and from his analyses of

certain claimed factual circumstances unique to this particular reorganization.

In *Consolidated Rock*, the Supreme Court stated: "Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility as well as the fairness of a plan of reorganization." 312 U.S. at 510, 61 S.Ct. at 685. Later in *Institutional Investors* the Court again emphasized that in a Section 77 proceeding, earning power was the primary criterion and, therefore, "[t]he basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn." 318 U.S. at 540, 541, 63 S.Ct. at 738. Since this determination by nature "requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made." *Consolidated Rock*, supra, 312 U.S. at 526, 61 S.Ct. at 685, see also *Dudley v. Mealey*, 147 F.2d 268, 270 (2 Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945). While definitive dollar values on the whole or on specific parts of the debtor's estate may be neither expected nor required, the reorganization court cannot, of course, resort to guesswork or conjecture. It is incumbent upon the court to exercise a wise informed judgment based on reasonable foreseeable factors to assure that creditors receive "full compensatory treatment." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 452, 88 S.Ct. 1157, 1177, 20 L.Ed.2d 1 (1968) (*"TMT Trailer"*); *Ecker v. Western Pacific R.R.*, 318 U.S. 448, 487, 63 S.Ct. 692, 713, 87 L.Ed. 803 (1943).

According to the trustee, these legal principles are especially suitable for application to the unusual facts and circumstances in the reorganization *sub judice*. He argues that the current market value of the Penn Central securities is not a reliable indicator of the worth of the New Haven's holdings because the investing public's perception of the true value of the securities has been distorted by various factors.

First, the Penn Central has just recently emerged from a lengthy and complex reorganization and the "stigma of bankruptcy" necessarily results in a serious depression in the market value of its securities. As explained by Mr. William S. Nydorf, one of the trustee's experts:

Any securities newly issued as a consequence of a bankruptcy reorganization are likely to be subject to substantial investor prejudice and must undergo a period of market seasoning before their relative attractiveness as an investing medium can be fully appraised. This is particularly important in the case of Penn Central, certainly one of the most spectacular and complex bankruptcies in the United States' financial history.

*Affidavit of William S. Nydorf With Respect to the Amended Plan of Reorganization for the Debtor* at 12 ("*Nydorf Affidavit*"). Second, the market place is unable to make sound business judgments concerning Penn Central at this time because of the major legal complexities of the Valuation Case. The Valuation Case is unique and at present has an indeterminable value; therefore, its uncertainty may adversely affect the market values of all the securities of Penn Central which are directly or indirectly tied to the ultimate receipt of the award in that case.

Third, the Penn Central securities at this time lack "seasoning" and "stability" because they are generally in the hands of large institutions and have not been sufficiently traded over a long period of time to reflect their true value. Finally, the trustee contends that the investing public's lack of knowledge about and confidence in certain features peculiar to Penn Central—the results and timing of the Asset Disposition Program, its unusual capital structure and debt cascades, its new management—make it highly unlikely that the market place has correctly appraised the value of the securities.

Utilizing the intrinsic value concept for the securities held by the New Haven, the trustee concludes that, with the cash on hand, the value of the New Haven estate for reorganization purposes is within a range of $120 million to $150 million, and that the value of the equity of the reorganized New Haven is commensurate with this value. At the high end, this valuation would provide compensation to the First Mortgage Bondholders to the full extent of their claim, as computed by the trustee, i. e., approximately $135.7 million ($76,819,900 in principal plus $58,895,251 in interest to date), as well as affording a present equity in the estate for the Income Bondholders. In practical effect, the Amended Plan affords the First Mortgage Bondholders 93.1%, and the Income Bondholders 6.9%, of the reorganized New Haven.

This is a significant modification of the treatment accorded the Income Bondholders in the plan of reorganization submitted to Judge Anderson in 1968. In ruling on that plan, Judge Anderson required that the First Mortgage Bondholders' claim of $101,-154,737 (principal amount of $76,819,900 plus post-bankruptcy interest of $24,334,837 from January 1, 1961 to December 2, 1968, the effective date of the plan) be satisfied by the issuance to them of common stock of the reorganized New Haven. When taken together with the Penn Central underwriting required by him, this would satisfy the First Mortgage Bondholders' total claim.[45] The holders of Income Bonds were to receive warrants to buy common stock at a price of $50 per share, which could only be exercised under certain specified conditions.

The more favorable treatment proposed in the Amended Plan for the second level bondholders is due to the trustee's analyses of the improved financial condition and stability of the New Haven since 1969, and his desire to provide the parties with a basic

45. *In re New York, N.H. & H.R.R.*, supra note 9, 304 F.Supp. at 809.

framework for a "compromise" or "consensual" plan of reorganization.[46]

The main components of the trustee's valuation are: 1) the cash assets; 2) an estimate of the intrinsic worth of the Penn Central securities held by the New Haven; and 3) a recognition of the real, but presently unquantifiable, values of certain tax attributes and corporate opportunities available to the reorganized New Haven.

*Cash* : At the present time, the cash assets of the New Haven are approximately $36.5 million. In addition, the trustee treats as the equivalent of cash for valuation purposes his claim in the amount of $2.15 million for reimbursement of fees and costs in the Penn Central reorganization proceedings under Section 77(c)(12) which is *sub judice*.

*Value of the Securities* : The trustee did not personally undertake the task of determining the present value of the Penn Central securities owned by the New Haven; rather, he relied on the analysis developed by his expert, Mr. Nydorf. In addition, he retained another expert, Mr. Thomas E. Dewey, Jr., to make an independent valuation in order to obtain a second opinion.

The valuation methodologies of both experts embodied studies of the two separate aspects of the Penn Central enterprise: 1) its ongoing non-railroad businesses, principally consolidated in the Pennsylvania Company ("Pennco"); and 2) its "discontinued businesses" which are involved in the Asset Disposition Program and the Valuation Case.

At the time the trustee's experts prepared their valuations, Pennco's operating subsidiaries were:

(a) Arvida (100% owned), a developer of residential, resort and other properties in Florida and Georgia;

(b) Buckeye Pipe Line Company (100% owned), a common carrier of petroleum products in Northeastern and Midwestern United States; its sister company, Buckeye Petro Fuels Company, markets fuel oil, gasoline, and propane gas;

(c) Great Southwest (94% owned), an operator of amusement parks and a wax museum;

(d) Edgington Oil Company (80% owned), a petroleum refiner that also manufactures and markets petroleum products;

(e) Clearfield Bituminous Coal Corp. (100% owned), a coal mining company; and

(f) Pennrec (100% owned), an owner of amusement parks.

---

**46.** On numerous occasions throughout these proceedings, this Court urged the parties to resolve their differences and agree upon a "consensual" plan. The Court recognized that an amicable settlement would be difficult; there were vast disparities between the two system bondholders in their respective views of the merits of the case, both legally and factually. A full victory for the First Mortgage Bondholders would result in their complete ownership of the reorganized New Haven; a full victory for the Income Bondholders would give them a substantial equity in the new company, with a surplus remaining. Thus, it was apparent that only by long and diligent negotiations, in a spirit of cooperation and due respect for each other's position, could these creditors produce a consensual plan.

In addition, unlike the strategy employed in the Penn Central reorganization where the representatives of all the principal creditors were convened to deliberate before a definitive plan was submitted to Judge Fullam, here a plan was filed by the trustee without consultation with or input from the representatives of the bondholders upon whom a consensual plan was completely dependent. To negotiate from positions already fixed in a document filed for the Court's approval and publicly reported, might well inhibit any meaningful "give and take" by these representatives because of their understandable reluctance to deviate to any great degree from the allocations presumably "cast in concrete" in the eyes of their numerous bondholders.

Despite these serious stumbling blocks, the Court was convinced that a compromise could be reached. Among other obvious benefits, millions of dollars would be saved by the estate and years of continued litigation would be avoided. The failure to draft a consensual plan is all the more disturbing because after several lengthy settlement conferences to which the Court was not privy, the parties reported that an amicable agreement was at hand and only a "few details" had to be worked out. Unfortunately, these details proved fatal to a resolution of the issues.

Subsequent to the experts' calculations on value, Pennco acquired the remaining minority interests in both Edgington Oil Company and Great Southwest, and purchased Williams Energy, a marketer of propane gas in over 25 states. In addition, after the closing arguments in these proceedings, Penn Central merged with another operating company, Marathon Manufacturing Company, which is one of the world's largest manufacturers of offshore drilling rigs.

In addition to valuing these income producing continuing businesses owned and operated by Pennco, the experts deemed it crucial to their methodologies to consider the cash that would be generated by the Asset Disposition Program ("ADP") and the anticipated range of awards likely to be received in the Valuation Case.

The ADP is a detailed plan pursuant to which most of the assets of Penn Central and its subsidiaries, except Pennco and the Valuation Case, will be liquidated in an orderly and systematic fashion prior to December 31, 1987. *In re Penn Central Transportation Co.*, supra, 458 F.Supp. at 1255.

As previously noted, the Valuation Case evolved from the dispute between the parties over the valuation of the Penn Central's rail assets which were transferred to Conrail in 1976 under the provisions of the RRRA. The novel and complex litigation presently pending before the Special Court, for a determination of the fair, equitable and constitutional terms of exchange, will undoubtedly take years to resolve unless a settlement is negotiated.

For the reasons discussed at length by Judge Fullam, 458 F.Supp. at 1270–76, and the Third Circuit, 596 F.2d at 1164–66, it is clear that the ultimate outcome of the Valuation Case will have a direct and substantial effect upon the Penn Central's ability to redeem a large number of its debt-type securities (Series B Notes, Series C Notes, Series D Notes, Series B Bonds, Preference Stock, and CBI). Any "spillover" from the award, i. e., the amount of recovery in excess of that required to retire all the Penn Central securities senior to the Com-

mon Stock, would presumably enhance the value of the Common Stock. Any increase in the value of the Common Stock, of course, necessarily depends on the size of the spillover and the timing of its payment.

In the instant proceeding, the trustee and the experts recognize that an assessment of the award, or range of awards, must be considered in the valuation of the Penn Central's securities held by the New Haven, particularly with respect to the 6% block of Common Stock owned by the estate.

Mr. Nydorf valued the New Haven's securities as of September 30, 1978, the date he assumed would be the effective date of the Amended Plan and the time at which the interest accruing on the First Mortgage Bonds would cease.

His evaluation proceeded on three basic premises which he determined to be valid:

1. The projections concerning the amounts and timing of the sales under the ADP should be accepted;

2. The appropriate range of values for Penn Central was between $662.3 million (the SEC's $600 million evaluation of Penn Central as of January 1, 1978, adjusted to reflect retained earnings for the first nine months of 1978) and $1 billion (based on Mr. Dewey's valuation of Penn Central of $969 million as of December 31, 1978); and

3. The Valuation Case would produce a recovery of not less than $500 million as of April 1, 1976, plus compound interest at 8% to date of payment.

*Nydorf Affidavit* at 6–9.

He then assigned a value to the Penn Central securities held by the New Haven which would be redeemed by the cash flow of the reorganized Penn Central, namely, all the Series A Bonds and a portion of the Series B Bonds. He assumed that the New Haven would receive $46,069,000 (including the $12,826,000 initial cash payment) in the ten-year period 1978 to 1987, which dis-

counted at appropriate rates,[47] would have a present worth (September 30, 1978) of $41,531,000.[48]

He also valued the securities held by the New Haven which would not be redeemed by the cash flow of the reorganized Penn Central, namely, the remaining Series B Bonds in the amount of $6,878,000 (including interest), the Series B Preference Stock, and the CBI. All these securities would be retired if the basic award from the Valuation Case was at least $887.4 million (April 1, 1976), for a total recovery of $2.1 billion (December 31, 1987). The New Haven would receive $59,078,000 from this recovery, which discounted,[49] has a present value (September 30, 1978) of $23,981,000.[50]

47. Mr. Nydorf applied a discount rate of 8%, which is "applicable to high grade debt obligations," on the Series A Bonds because of the "minimal risk that the projected receipts would be as forecast." A one percent additional discount was applied to the projected payments on the Series B Bonds because the "payments are junior to the claims of the Series A Bonds to Asset Disposition Proceeds and thus bear the risk of any shortfalls in the Asset Disposition Program and would become dependent for payment of these amounts upon the Valuation Case Proceeds." *Nydorf Affidavit* at 13–14.

48.

Exhibit 1

(1)
Estimated Receipts of Cash by New Haven
Pursuant to Penn Central Plan
($000 omitted)

| Date or Year | Cash (3) | Mortgage Bonds Series A | Mortgage Bonds Series B | Total | Cash | Present Value at 9/30/78 (2) Mortgage Bonds Series A | Present Value at 9/30/78 (2) Mortgage Bonds Series B | Total |
|---|---|---|---|---|---|---|---|---|
| At Consummation | $12,826 | — | — | $12,826 | $12,826 | — | — | $12,826 |
| 1978 | — | $13,706 | — | 13,706 | — | $13,445 | — | 13,445 |
| 1979 | — | 3,648 | — | 3,648 | — | 3,313 | — | 3,313 |
| 1980 | — | 8,158 | — | 8,158 | — | 6,861 | — | 6,861 |
| 1981 | — | 778 | $ 336 | 1,114 | — | 606 | $ 254 | 860 |
| 1982 | — | 1,832 | 336 | 2,168 | — | 1,321 | 233 | 1,554 |
| 1983 | — | 1,104 | 1,664 | 2,768 | — | 737 | 1,058 | 1,795 |
| 1984 | — | — | 474 | 474 | — | — | 277 | 277 |
| 1985 | — | — | 474 | 474 | — | — | 254 | 254 |
| 1986 | — | — | 397 | 397 | — | — | 195 | 195 |
| 1987 | — | — | 336 | 336 | — | — | 151 | 151 |
| Total | $12,826 | $29,226 | $4,017 | $46,069 | $12,826 | $26,283 | $2,422 | $41,531 |

(1) Based upon November, 1977 Penn Central projection.
(2) At discount rates of 8% for the Series "A" Bond receipts and 9% for the Series "B" Bond receipts.
(3) Adjusted to reflect assumed earnings at the rate of 8% per annum for the interim between 1/1/78 and 9/30/78.

*Nydorf Affidavit* Exhibit 1

49. Based upon "estimates of the likelihood of achieving such recoveries," Mr. Nydorf adopted a discount rate of 10% for the Preference Stock, i. e., a premium of 25% over the basic 8% rate applicable to the Series B Bond proceeds, and a discount rate of 12% for the CBI payments, i. e., a premium of 50% over the rate attributable to the Series B Bonds proceeds. *Nydorf Affidavit* at 17.

Thus, as of September 30, 1978, Mr. Nydorf concluded that the value of the securities senior to the Common Stock, together with cash payments received, was $65.5 million.

To this, he added a range of values for the New Haven's interest in the equity of the reorganized Penn Central, i. e., the New Haven's 6% block of Penn Central Common Stock, based on the range between the values placed on Penn Central by the SEC, as updated, of $662.3 million and by Mr. Dewey of $969 million, rounded off to $1 billion.

The value of the 6% block would, therefore, be between $39.7 million and $60 million.

The next factor Mr. Nydorf considered was the enhancement of the Common Stock from any Valuation Case spillover. He opined that the base award would probably be within the range of $1 billion to $2.5 billion. Using increasing discount rates for various segments of the range of assumed awards,[51] he calculated that a base award of $1.4 billion (using Mr. Dewey's valuation of Penn Central)[52] or a base award of $2.25 billion (using the SEC's valuation of Penn Central)[53] would be necessary to justify the

**50.**                                                                                   Exhibit 2

### Valuation Case Proceeds Required to Discharge Security Claims
($000 omitted)

| | (1) Security | (2) Base Value at 4/1/76 Required to Satisfy Claims in Full | (3) Valuation Case Proceeds at 12/31/87 | (4) Amounts To Be Received by New Haven at 12/31/87 | (5) Discount Rate | (6) Present Value 9/30/78 of Amounts to be Received by New Haven on 12/31/87 |
|---|---|---|---|---|---|---|
| Series B Bonds | | $572,363 | $1,413,842 | $ 6,878 | 8% | $ 3,375 |
| Preference Stock | | 798,298 | 1,971,942 | 36,300 | 10% | 15,032 |
| CBI's | | 887,360 (1) | 2,191,942 | 15,900 | 12% | 5,574 |
| TOTAL | | | | $59,078 | | $23,981 |

(1) See note 6, p 12, of opinion of Judge Fullam dated 8/17/78.

*Nydorf Affidavit* Exhibit 2

**51.**                                                                                   Exhibit 3

### Application of Discount Rates Derived From 1.2 (8%) To Each Assumed $250 Million of Valuation Case Awards Up To $2,500 Million
($000,000)

| | Value Block | 12/31/87 Cumulative | 1.2 (8%) Discount Rates | Discounted Values 10/1/78 Block | Cumulative |
|---|---|---|---|---|---|
| Up to $500 | 1,235.1 | 1,235.1 | 8.0 | 606.1 | 606.1 |
| 501 - 750 | 617.5 | 1,852.6 | 9.6 | 264.5 | 870.6 |
| 751 - 1,000 | 617.6 | 2,470.2 | 11.52 | 225.3 | 1,095.9 |
| 1,001 - 1,250 | 617.5 | 3,087.7 | 13.824 | 186.4 | 1,282.3 |
| 1,251 - 1,500 | 617.6 | 3,705.3 | 16.5888 | 149.3 | 1,431.6 |
| 1,501 - 1,750 | 617.5 | 4,322.8 | 19,90656 | 115.2 | 1,546.8 |
| 1,751 - 2,000 | 617.6 | 4,940.4 | 23.887872 | 85.2 | 1,632.0 |
| 2,001 - 2,250 | 617.5 | 5,557.9 | 28.665446 | 60.0 | 1,692.0 |
| 2,251 - 2,500 | 617.6 | 6,175.5 | 34.398536 | 40.1 | 1,732.1 |

*Nydorf Affidavit* Exhibit 3

**52, 53.** Note 52 on p. 779, note 53 on p. 780.

52.*

**Exhibit 5**

**Analysis of Relative Values of New Haven 4's and 4 1/2's Assuming Various Valuation Case Awards and T.E. Dewey, Jr. Value for Reorganized PC Common Exclusive of Valuation Case**

($000,000 omitted)

| | Based Upon Assumed Valuation Case Awards Of | | | | | | | Awards Req. to Justify | |
|---|---|---|---|---|---|---|---|---|---|
| | $1,000 | $1,250 | $1,500 | $1,750 | $2,000 | $2,250 | $2,500 | Undiluted Allocation | Fully Dil. Allocation |
| Val. Award at 8% Compound Int. - 12/31/87 | $2,470.2 | $3,087.7 | $3,705.3 | $4,322.8 | $4,940.4 | $5,557.9 | $6,175.5 | $3,365.2 | $3,323.8 |
| Amt. Req. through CBI's | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 |
| Avail. for Common at 12/31/87 from V.C. | 278.3 | 895.8 | 1,513.4 | 2,130.9 | 2,748.5 | 3,166.0 | 3,983.8 | 1,173.3 | 1,131.9 |
| Discounted value of Common at 10/1/78 (A) | 101.5 | 278.9 | 437.2 | 552.4 | 637.6 | 697.6 | 737.7 | 355.0 | 345.0 |
| T.E. Dewey, Jr. valuation of Common | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 |
| Value of Reorganized P.C. Common - 10/1/78 | 1,101.5 | 1,278.9 | 1,437.2 | 1,552.4 | 1,637.6 | 1,697.6 | 1,737.7 | 1,355.0 | 1,345.0 |
| *Effect Upon N.H. Plan* | | | | | | | | | |
| Value of P.C. package at 10/1/78 (B) | | | | | | | | | |
| Cash | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 |
| "A" Bond receipts | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 |
| "B" Bond receipts | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 | 5.8 | 5.8 |
| Preference Stock | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| CBI's | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 |
| Common - 6% participation | 66.1 | 76.7 | 80.2 | 93.1 | 98.3 | 101.9 | 104.3 | | 80.8 |
| Total | 131.6 | 142.2 | 151.7 | 158.6 | 163.8 | 167.4 | 169.8 | 146.2 | 146.2 |
| Less Est. shortfall in other assets with respect to other liabilities | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Balance available to 4's and 4 1/2's - value of new common - fully diluted | 126.6 | 137.2 | 146.7 | 153.6 | 158.8 | 162.4 | 164.8 | 141.8 | 141.2 |
| Less PA of 4's | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 |
| Balance - value of new common - undiluted basis | 49.8 | 60.4 | 69.9 | 76.8 | 82.0 | 85.6 | 88.0 | 65.0 | 131.3 |
| Interest claim - 4's | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 |
| Balance for 4 1/2's | (4.7) | 5.9 | 15.4 | 22.3 | 27.5 | 31.1 | 33.5 | 10.5 | 9.9 |
| Value of 16.2% int. in new common (undiluted) | 8.1 | 9.8 | 11.3 | 12.4 | 13.3 | 13.9 | 14.3 | 10.5 | 9.9 |
| Value of 7% int. in new common (fully diluted) | 8.9 | 9.6 | 10.3 | 10.8 | 11.1 | 11.4 | 11.5 | 9.9 | 9.9 |

(A) At graduated rates of discount based upon application of 1.2 (8%) to each successive $250 of assumed Valuation Case award above $500 million.

(B) See Exhibits 1 and 2.

9/17/78

\* During the course of the testimony regarding the above reproduced tables, which were exhibits to Mr. Nydorf's affidavit, certain corrections, not reflected here, were made but have no effect on the exhibits for the purposes for which they are being referred to here.

*Nydorf Affidavit* Exhibit 5

53.*

**Exhibit 4**

Analysis of Relative Values of New Haven 4's and 4 1/2's Assuming Various Valuation Case Awards and SEC Value for Reorganized PC Common Exclusive of Valuation Case

($000,000 omitted)

| | Based Upon Assumed Valuation Case Awards Of | | | | | | | Awards Req. to Justify | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | $1,000 | $1,250 | $1,500 | $1,750 | $2,000 | $2,250 | $2,500 | Undiluted Allocation | Fully Dil. Allocation |
| Val. Award at 8% Compound Int. - 12/31/87 | $2,470.2 | $3,007.7 | $3,705.3 | $4,322.8 | $4,940.4 | $5,557.9 | $6,175.5 | $5,507.5 | $5,404.6 |
| Amt. Req. through CBI's - 12/31/87 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 | 2,191.9 |
| Avail. for Common at 12/31/87 from V.C. | 278.3 | 895.8 | 1,513.4 | 2,130.9 | 2,748.5 | 3,366.0 | 3,983.6 | 3,315.6 | 3,212.7 |
| Discounted Value of Common at 10/1/78 (A) | 101.5 | 278.9 | 437.2 | 552.4 | 637.6 | 697.6 | 737.7 | 692.7 | 692.7 |
| SEC value of Common adjusted to 10/1/78 | 662.3 | 662.3 | 662.3 | 662.3 | 662.3 | 662.3 | 662.3 | 662.3 | 662.3 |
| Value of Reorganized P.C. Common - 10/1/78 | 763.8 | 941.2 | 1,099.5 | 1,214.7 | 1,299.9 | 1,359.9 | 1,400.0 | 1,355.0 | 1,345.0 |
| *Effect Upon N.H. Plan* | | | | | | | | | |
| Value of P.C. package at 10/1/78 (B) | | | | | | | | | |
| Cash | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 |
| "A" Bond receipts | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 |
| "B" Bond receipts | 5.8 | 5.8 | 5.8 | 5.8 | 5.8 | 5.8 | 5.8 | 5.8 | 5.8 |
| Preference Stock | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| CBI's | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 | 5.6 |
| Common - 6% participation | 45.8 | 56.5 | 66.0 | 72.9 | 78.0 | 81.6 | 84.0 | 81.1 | 80.7 |
| Total | 111.3 | 122.0 | 131.5 | 138.4 | 143.5 | 147.1 | 149.5 | 146.8 | 146.2 |
| Less Est. shortfall in other assets with respect to other liabilities | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Balance available to 4's and 4 1/2's - value of new common - fully diluted | 106.3 | 117.0 | 126.5 | 133.4 | 138.5 | 142.1 | 144.5 | | 141.2 |
| Less PA of 4's | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | |
| Balance - value of new common - undiluted basis | 29.5 | 40.2 | 49.7 | 56.6 | 61.7 | 65.3 | 67.7 | 65.0 | 131.3 |
| Interest claim - 4's | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | 54.5 | |
| Balance for 4 1/2's | (25.0) | (14.3) | (4.8) | 2.1 | 7.2 | 10.8 | 13.2 | 10.5 | 9.9 |
| Value of 16.2% int. in new common (undiluted) | 4.8 | 6.5 | 8.1 | 9.2 | 10.0 | 10.6 | 11.0 | 10.5 | |
| Value of 7% int. in new common (fully diluted) | 7.4 | 8.2 | 8.9 | 9.3 | 9.7 | 9.9 | 10.1 | 9.9 | 9.9 |

(A) At graduated rates of discount based upon application of 1.2 (8%) to each successive $250 of assumed Valuation Case award above $500 million.
(B) See Exhibits 1 and 2.

9/17/78

\* During the course of the testimony regarding the above reproduced tables, which were exhibits to Mr. Nydorf's affidavit, certain corrections, not reflected here, were made but have no effect on the exhibits for which they are being referred to here.

*Nydorf Affidavit* Exhibit 4

trustee's allocations between the two system bondholders as set forth in his Amended Plan.

Because "the Valuation Case awards required to make the allocations [in the trustee's Amended Plan] fair on a figure basis are well within the range of possible awards," Mr. Nydorf concluded that the Amended Plan was fair, equitable and feasible. *Nydorf Affidavit* at 22.

Mr. Dewey valued the assets of the New Haven as of December 31, 1978. In doing so, he assumed that the proceeds from the ADP would be realized as projected by the Penn Central trustees, and that the recovery from the Valuation Case would be not less than $500 million, plus compound interest at 8% from April 1, 1976 to date of payment.

He was of the opinion, however, that the two previous studies evaluating the constituent businesses of Penn Central, i. e., the SEC's and Kuhn Loeb's reports, were effectively outdated. He, therefore, valued the individual components of the Penn Central's continuing businesses as of December 31, 1978. His findings may be summarized as follows:

| | |
|---|---|
| Arvida Corporation | $300,000,000 [54] |
| Buckeye Pipe Line Company | 160,000,000 [55] |
| Great Southwest Corporation | 100,000,000 [56] |
| Edgington Oil Company, Inc. | 70,000,000 [57] |
| Clearfield Bituminous Coal Corp. | 25,000,000 [58] |
| Pennrec | 20,000,000 [59] |

54. In valuing Arvida, Mr. Dewey began with a November 14, 1976 appraisal for its real estate and operating properties of $221 million. He then posited that Arvida's other assets were approximately equal to its liabilities and, therefore, no adjustment to the appraisal was necessary for either of those two items. Then, based upon growth in land values in the general location of Arvida's holdings, coupled with its ability to maintain its inventories of properties and its other investments, he determined that an annual growth rate of 15% for the two years following the appraisal would be reasonable. Applying that growth rate to the appraisal value, he determined Arvida's worth to be $292 million. He then rounded this value up to $300 million to take into account what he described as the company's superior management, "the uniqueness of [its] position and record and the current attraction of properties of this type." *Affidavit of Thomas E. Dewey, Jr. With Respect to Amended Plan of Reorganization Dated April 18, 1978* at 12–13.

55. With respect to Buckeye Pipe Line Company, Mr. Dewey adopted a Kuhn Loeb valuation which was based on a forecast of Buckeye's future operations. Finding that in fact, in Mr. Dewey's opinion, Buckeye was running close to forecasts, the Kuhn Loeb valuation of $155 million as of December 31, 1977 was rounded off to $160 million to reflect its reinvestment of earnings during 1978.

56. As a starting point for his valuation of Great Southwest, Mr. Dewey used a figure of $82 million, which was based on an outstanding offer by Pennco to mmority shareholders of Great Southwest of $19 a share. That figure was then adjusted upward to $100 million, approximately 20%, to reflect what he viewed as a reasonable premium for acquiring the shares of the entire company, its excellent position in the industry, and its superior management and earnings performance in the recent past.

57. In his analysis of Edgington Oil Company, Mr. Dewey first considered the book value of the company as of June 30, 1978 which was $56 million. To value Pennco's 80% holding, he calculated that the book value of the whole company would be $70 million at year-end using projected earnings for 1978 of $27 million. As a multiple of earnings, the $70 million is a little more than three times 80% of earnings as projected for 1978, and, is a premium of approximately 25% over 80% of the book value. In Mr. Dewey's opinion, a multiple of earnings in that range or a premium over book in that range would be conservative in view of the competitive position of the company in the market. He, therefore, valued the 80% holding at $70 million.

58. In this instance, Mr. Dewey agreed with the value of $22.8 million placed on the Clearfield Bituminous Coal Corp. by Kuhn Loeb as of December 31, 1977. The operations were running close to the forecast of the Penn Central trustees so the only adjustment Mr. Dewey made to the Kuhn Loeb value was an increase to $25 million which, in his opinion, was justified by inflation and by increased core drillings in 1978.

59. In valuing Pennrec, Mr. Dewey took its book value of $23 million as of June 30, 1978, and discounted it to $20 million. While Pennrec at the time was not a profitable company, Mr. Dewey justified the slight discount on the basis of an operating profit before interest and debt expenses of approximately $1 million during the first six months of 1978, the size of the market in the area of its major operating asset, Great Adventure, and on the abilities of management.

| | |
|---|---|
| Tax Loss Carryforwards 1979 through 1982 | 160,000,000 [60] |
| Corporate Administrative Expenses 1979 through 1982 | (20,000,000) [61] |
| Non-Pennco Future Coal Royalties | 80,000,000 [62] |
| Subsidized Rail Rentals | 26,000,000 [63] |
| Real Estate Unsold at December 31, 1987 | 36,000,000 [64] |
| 1983–1987 Tax Deductions | 12,000,000 [65] |
| Total | $969,000,000 |

Having determined the worth of the ongoing businesses and other assets of the reorganized Penn Central, Mr. Dewey then proceeded to value the securities owned by the New Haven. Using a series of ascending discount rates,[66] he projected that present values of the cash flows anticipated to be received upon redemption of the Series A Bonds, Series B Bonds, Series B Preference Stock, and CBI, to be $56.12 million. To this, he added the values represented by the 6% block of Penn Central's Common Stock of $58.14 million, and the cash on hand of $13.07 million. After deducting certain claims senior to the bondholders, he concluded that the equity of the New Haven for reorganization purposes was $118.3 million, excluding consideration of any spillover value for the Common Stock from the Valuation Case.[67]

**60.** Mr. Dewey anticipated continuing acquisitions by the reorganized Penn Central would utilize substantial tax loss carryforwards which could be offset against increased earnings. As he explained:

These valuations have been made in accordance with standard financial practice, which assumes full taxation. Assuming, then, that these present earnings, estimated at more than $90 million for 1978, continue, I can add to the Pennco valuation the value of future tax loss carryforwards, as of December 31, 1978. Again, I will use the SEC methodology, which is to run through 1982 (the year of expiration of the pre-1978 tax losses) and then use a lump sum for succeeding years. Assuming that pre-tax earnings average $100 million for the years 1979 through 1982, the value, discounted at 8% from the middle of each year, of being relieved of a 48% corporate income tax during the period 1979–1982 would be approximately $160 million.

*Dewey Affidavit* at 17.

**61.** Having taken credit for four further years of tax loss carryforwards (see note 60, supra), Mr. Dewey recognized he had to take into account the expenses of continuing Pennco as an operating entity. Corporate administrative expense was $2.3 million for the first six months of 1978, therefore, he assumed an annual figure of $5 million or a total of $20 million for the years 1979 through 1982.

**62.** For a valuation of the non-Pennco future coal royalties, the subsidized rail rentals and the unsold real estate on December 31, 1987, Mr. Dewey accepted the numbers set forth in the SEC analysis, and discounted the figures to December 31, 1978 at 8% per annum.

**63.** See note 62, supra.

**64.** See note 62, supra.

**65.** Mr. Dewey valued the 1983–1987 tax deductions, less reorganized Penn Central's corporate expenses in excess of $10 million annually, at approximately $12 million.

**66.** No discount was applied to the cash and the Common Stock attributable to the ongoing business. Payments on Series A Bonds after 1978 were discounted at 8%, as the average rate for high-grade obligations. Series B Bonds receipts were discounted at 8.5%, to reflect the junior status of these securities with respect to the ADP and the longer average life of the issue. The Preference Stock was considered a more speculative security so Mr. Dewey applied an 11% rate of discount; a 13% rate was used for the CBI, junior securities to the Preference Stock with a no fall-back basis.

**67.** See note 67 on page 783.

Exhibit 6

67.

Valuation at December 31, 1978 of the Estate of The New York, New Haven and Hartford Railroad Company

Anticipated Cash Receipts
(in 000's)

| Source | At Consummation of Penn Central Plan | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | $13,068 | | | | | | | | | | | $ 13,068 |
| Series A Bonds | | $13,706 | $ 3,648 | $ 8,158 | $ 778 | $ 1,832 | $ 1,104 | | | | | 29,226 |
| Series B Bonds | | | | | $ 336 | $ 336 | $ 1,664 | $ 474 | $ 474 | $ 397 | $ 7,214 | 10,895 |
| Preference Stock | | | | | | | | | | | $36,300 | 36,300 |
| Certificates of Beneficial Interest | | | | | | | | | | | $15,900 | 15,900 |
| Common Stock | $58,140 | | | | | | | | | | | 58,140 |
| Total | | | | | | | | | | | | $163,529 |

Discounted Values* (Present Worth as of 12/31/78)

| Source | At Consummation of Penn Central Plan | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | $13,068 | | | | | | | | | | | $13,068 |
| Series A Bonds | | $13,706 | $ 3,378 | $ 6,994 | $ 618 | $ 1,347 | $ 751 | | | | | 26,794 |
| Series B Bonds | | | | | $ 263 | $ 242 | $ 1,107 | $ 291 | $ 268 | $ 207 | $ 3,462 | 5,840 |
| Preference Stock | | | | | | | | | | | $14,191 | 14,191 |
| Certificates of Beneficial Interest | | | | | | | | | | | $ 5,293 | 5,293 |
| Common Stock | $58,140 | | | | | | | | | | | 58,140 |
| Total | | | | | | | | | | | | $123,326 |
| Less Excess of Claims Senior to Bonds Over Other Assets | | | | | | | | | | | | $5,000 |
| Net Value | | | | | | | | | | | | $118,326 |

* Series A Bonds at 8%; Series B Bonds at 8.5%; Preference Stock at 11%; Certificate of Beneficial Interest at 13%; Cash and Common Stock not discounted.

*Dewey Affidavit* Exhibit 6

Mr. Dewey next considered the extent to which the value of $118.3 million would be increased by Valuation Case base awards between $1 billion and $2.5 billion, a range of recoveries he believed to be reasonably probable.[68] Based on this analysis he ascertained that a base award of approximately $1.4 billion would be the "breakeven" point for the allocations between the two system bondholders under the Amended Plan.

Under these circumstances, he concluded that the Amended Plan was fair, equitable and feasible.

*Intangible Values*: The third salient element in the trustee's methodology is a recognition of the real, but presently unquantifiable, values inhering in the New Haven estate because of the tax attributes of the reorganized New Haven, and its other corporate opportunities, which he describes as its attractiveness as a candidate for merger and the "block" value of its Penn Central Common Stock.

The trustee is of the opinion that several tax rulings received by the New Haven confer important tax benefits on the estate and its bondholders. The principal tax benefits derive from the ruling that the New Haven has a high tax basis for its Penn Central securities (other than the CBI).

When conveyed to Penn Central in late 1968, the New Haven's operating assets had a basis for tax purposes of about $300 million. In private letter rulings issued September 24, 1970, and May 14, 1979, the Internal Revenue Service (IRS) determined that: 1) the transactions of conveyance between the New Haven and the Penn Central in 1968 was a tax-free exchange under § 374 of the Internal Revenue Code; 2) the New Haven did not recognize a tax loss in 1968; and 3) the New Haven's tax basis in its Penn Central securities will be the same as the basis of the assets conveyed to Penn Central in 1968, reduced by cash and the value of the liabilities assumed, indebtedness cancelled, and other property received.

Under the ruling letters from the IRS, the basis of the property conveyed to Penn Central in 1968, reduced as aforementioned, is to be allocated among the Series A and Series B Bonds, the Preference Stock, and the Common Stock in proportion to the fair

68.

Exhibit 7

### Analysis of Treatment under Plan of First Mortgage and Income Bonds

Valuation Case Awards
(Amounts in 000,000's)

| | $1,000 | $1,449.9 | $1,468.9 | $1,500 | $1,750 | $2,000 | $2,500 |
|---|---|---|---|---|---|---|---|
| Amount Available for Common* | 4.7 | 23.7 | 24.5 | 25.8 | 36.3 | 46.9 | 67.9 |
| Net Value From Exhibit 6 | 118.3 | 118.3 | 118.3 | 118.3 | 118.3 | 118.3 | 118.3 |
| Total | 123.0 | 142.0 | 142.8 | 144.1 | 154.6 | 165.2 | 186.2 |
| Less Principal Amount of 4's | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 | 76.8 |
| Balance | 46.2 | 65.2 | 66.0 | 67.3 | 77.8 | 80.4 | 109.4 |
| Less Interest Claim of 4's (through 12/31/78) | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 |
| Balance Available for 4-1/2's | 0 | 9.9 | 10.7 | 12.0 | 22.5 | 33.1 | 54.1 |
| Undiluted Common Stock Value for 4-1/2's | 7.5 | 10.6 | 10.7 | 10.9 | 12.6 | 14.3 | 17.7 |
| 4-1/2's Gain (Loss) | 7.5 | .7 | 0 | (1.1) | (9.9) | (18.8) | (36.4) |
| Fully Diluted Common Stock Value for 4-1/2's | 8.6 | 9.9 | 10.0 | 10.1 | 10.8 | 11.6 | 13.0 |
| 4-1/2's Gain (Loss) | 0.6 | 0 | (0.7) | (1.9) | (11.7) | (21.5) | (41.1) |

*New Haven's 6% Share of Penn Central Common

*Dewey Affidavit* Exhibit 7

market value of each. This allocation results in a tax basis for the Preference Stock well in excess of its liquidation or redemption value and a basis for the Bonds well in excess of their principal amount. Thus, any disposition of the Preference Stock or the Bonds will result in a tax loss. In addition, the Common Stock has a tax basis substantially higher than its current market value.

Under these rulings, the trustee predicts that tax savings are available and may be realized in several ways. For example, because the market value of the Series A and Series B Bonds, Preference Stock, and Common Stock are considerably less than the basis allocated to them, the sales or exchanges of these securities would generate large capital losses. Such transactions could be timed to offset capital gains on other investments or to reduce or eliminate current earnings and profits of the reorganized New Haven. Elimination of earnings and profits could benefit the equity owners of the reorganized New Haven as well as the company, itself. Under § 301 of the Code, so long as the new company had neither current nor accumulated earnings and profits, distributions to its equity owners would be deemed first to be returns of capital (non-taxable) until the owners have recovered their own respective tax bases, and then as capital gains. The trustee believes that by careful and appropriate timing of the sales or exchanges of the Penn Central securities, the reorganized New Haven would be able for a considerable time in the future to create ordinary and capital losses sufficient to insure it would have no current earnings, so that the equity owners would be able to utilize the tax benefits.

With respect to the Series A and Series B Bonds, the trustee expects the reorganized New Haven would make use of the bonds' high bases other than by a sale for capital losses. Redemption of these bonds for less than their bases results in an ordinary loss in the year of redemption. Losses incurred because of redemptions before consummation could be carried forward for the following seven years. Also, under a ruling issued to the Penn Central trustees, holders of Series A and Series B Bonds can amortize anticipated losses resulting from future redemptions over the term of the bonds. Under this ruling, the reorganized New Haven could, in the trustee's view, expect at least some ordinary loss in each year through 1987, unless all the bonds are redeemed before then.

In addition the trustee is of the opinion that maximization of operating losses could have potential additional benefits. There would exist the possibility of what the trustee terms "merchandising" its losses if certain carefully structured transactions between the reorganized New Haven and a "partner" looking to shelter some of its income were accomplished.

Although the trustee considers these tax attributes are valuable assets in the New Haven estate, he does not quantify them.

The trustee further believes that the "block" character of the New Haven's 6% holding of Common Stock (one of the largest single blocks of voting and equity ownership in the reorganized Penn Central) warrants an additional "plus value" which he does not quantify.

Thus, the trustee concludes that a reorganization value for the New Haven is between $120 million and $150 million, based on his appraisals of the cash on hand, the Nydorf valuation of the securities, and a recognition of the real, but unquantifiable, intangible attributes inherent in the New Haven. The floor estimate of $120 million gives little if any recognition to a spillover value from the Valuation Case; the ceiling figure of $150 million assumes a recovery on the lower end of the scale of possible recoveries insofar as a spillover is concerned.

### The First Mortgage Bondholders' Methodology

In marked contrast to the trustee's position, the basic argument of the First Mortgage Bondholders is that fair market value, almost wholly derived from market price, constitutes the primary criterion for determining the reorganization value of the New

Haven. They argue that it is logical and practical for the Court to calculate the net asset value of the New Haven and the reorganized company mathematically by reference to the opinion of investors in the open market because, except for cash, the estate consists solely of marketable securities.

While recognizing the intrinsic value concept in principle, they contend it is inapplicable as employed by the trustee because there is and has been broad, active, and orderly sales of the Penn Central securities over an extended period of time which establishes the market place as the primary and most reliable indicator of value.

Reliance is placed on a series of cases which they construe to require the Court to find, as a matter of law, that the present market value of the New Haven securities is the equivalent of their value for reorganization purposes. They cite *E. I. duPont de Nemours & Co. v. Collins*, 432 U.S. 46, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977), in which the Supreme Court referred to the SEC's expertise in merger cases and sustained the agency's method of valuing a closed-end investment company by the market price of the underlying securities it owned. Also discussed is *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 361–62 (2 Cir. 1979), wherein the Second Circuit stated that "in a free and actively traded market, absent compelling reasons to believe otherwise, the market price [of stock] is held to take account of asset value as well as the other economic, political, and financial factors that determine 'value.'"

*Central States Electric Corp. v. Austrian*, 183 F.2d 879 (4 Cir. 1950), cert. denied, 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662 (1951), is claimed to be a parallel case. There, in a Chapter X reorganization of a closed-end investment company, the plan of reorganization provided for the collapse of the "pyramid" of various companies into a single investment company. The stock of the reorganized company was to be issued first to bondholders for their claim, with interest, and then to senior preferred shareholders, with accrued dividends, on the basis of the

underlying net asset value of the new investment company as of the effective date of the plan. The common stockholders, who were eliminated from receiving shares of the reorganized company, challenged the valuation method approved by the reorganization court and the SEC because "the assets of the corporation were not valued at 'going concern' value to include such matters as probable enhancement in values of securities held, increase in dividends, investment of amounts now held in cash and government bonds, restoration of 'leverage' through the borrowing of money and the earnings of skilled management in the purchase and sale of securities." *Id.* at 884. The Fourth Circuit rejected these contentions, concluding:

> [W]e agree with it [the SEC] that the proper method of valuing the assets of an investment company such as this is not prospective earnings, as in the case of a manufacturing or railroad corporation, but the presently realizable market value of the securities on hand.

*Id.*; see also *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239, 1247 (7 Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) ("[W]hen market value is available and reliable, other factors should not be utilized in determining whether the terms of [the] merger were fair."); *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 84 (3 Cir.), cert. denied, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975) ("The better view is that the market does provide the best evidence of the value, notwithstanding a depressed state, or even a large-scale manipulation, of the market as a whole."); *In re Equity Funding Corp. of America*, 416 F.Supp. 132, 144 (C.D.Cal.1975) (The market value of assets such as stocks and bonds "is the appropriate measure of their value for reorganization purposes, since the value determined by investors in the market place is the best indicator of the present value of the future earnings of the assets.").

In support of their position that the average market price is the primary determinant of reorganization value, as a factual matter, the First Mortgage Bondholders

rely principally on the testimony of their expert, Mr. Stanley S. Shuman.

Based on his study of the market, his research, and his conferences with other experts, he determined that the market generally was stable and orderly, and that for Penn Central securities it was active, free and orderly. He therefore concluded that the New Haven, which is the holder of only cash and marketable securities and is not an operating company, should be valued by aggregating its cash and the fair market value of its securities. He defined fair market value as "the price at which willing and informed buyers, and willing and informed sellers, acting under no compulsion, will trade."

However, Mr. Shuman did not accept the market prices of the securities at face value. After an evaluation of the trading prices and the yield of each Penn Central security, he tested the market's conclusions by comparing the yield and quality of each security to comparable securities trading in the open market.

The following table summarizes Mr. Shuman's findings concerning the fair market value of the New Haven estate, as of the end of February 1979, net of claims senior to the First Mortgage Bonds:

| | |
|---|---|
| Cash | $17,426,677 |
| Penn Central securities: | |
| — Series A Bonds | 12,377,250 |
| — Series B Bonds | 3,532,500 |
| — Series B Preference Stock | 9,755,625 |
| — Certificates of Beneficial Interest | 2,007,375 |
| — Common Stock | 23,978,552 |
| Recovery of New Haven Legal Expenses from Penn Central | 2,150,000 |
| Total | $71,227,979 |

His valuation methodology with respect to each of the securities is as follows:

*Series A Bonds* : These Bonds are traded on the New York Stock Exchange. Prior to December 13, 1978, they traded at a range between 87 and 80½. Thereafter, the trading range was between 78⅞ and 70⅛, with the closing price for February 28, 1979 at 72¾. He believed the decline after December 13, 1978 was due to the drawings for redemption of a portion of the Bonds in December 1978. Total volume of sales was $1,281,000 for December 1978, $1,802,000 for January 1979, and $870,000 for February 1979. Based on the foregoing, he concluded that $727⅛ per $1000 Bond was a reasonable market price for the Bonds.

Mr. Shuman then sought to establish comparability by assigning a "rating" for the Series A Bonds. Because neither *Standard & Poor's* nor *Moody's* had ratings for the Penn Central debt-type securities, Mr. Shuman studied the relevant characteristics of the Bonds and concluded that they would receive a rating no higher than "A" [69] if classified by *Moody's*.

He then examined bonds with comparable ratings to test the market price of the Series A Bonds. He reviewed the asset coverages, current yields and the yield-to-maturity of comparably rated bonds and found that the yield-to-maturity of the Series A Bonds, on a number of assumptions as to payment, was greater than that of the other bonds reviewed. He attributed this difference to the Series A Bonds' low asset coverage, the size of senior claims, the lack of current interest payments, and the possibility of an extended maturity. After making an adjustment to average market price because he believed that newly released material information concerning the Bonds had not been fully digested by investors, he decided that market price could not be accepted as the primary indicator of value at the time he made his valuation.

Based on these factors, Mr. Shuman determined that a market price of $750 reflected the fair market value for the Series A Bond and, therefore, the total value for the New Haven's holdings of these securities was $12,377,250.

---

**69.** Bonds which are rated A possess many favorable investment attributes and are to be considered as upper medium grade obligations. Factors giving security to principal and interest are considered adequate but elements may be present which suggest a susceptibility to impairment sometime in the future.

*Series B Bonds*: Trading on a "when-issued" basis for these Bonds commenced on the New York Stock Exchange on November 14, 1978. Through December 20, 1978, they traded in the range of $50¼ to $46½. Regular trading of the Bonds began December 22, 1978, at a price of $48½. Thereafter, until March 1979, the Bonds traded in the range of $48½ to $45. Daily volume for February 1979 averaged $26,277 principal amount and totalled $473,000 for the month.

Establishing comparability in the same fashion as he did for the Series A Bonds, Mr. Shuman decided the Series B Bonds would be rated no higher than "Ba" [70] by *Moody's*, and that a $471 market price valuation per Bond would be proper. The New Haven's holdings, therefore, amounted to $3,532,500.

*Series B Preference Stock*: During the period November 14, 1978 and December 20, 1978, when the Series B Preference Stock was sold on a when-issued basis, it traded in the range of $6⅜ to $5. After regular trading of this Stock began on December 21, 1978, it sold in the range of $6⅜ to $5 through February 1979. An aggregate of 692,800 shares of the Stock was traded in February 1979.

Following the same procedure for determining comparability as he did for the Bonds, Mr. Shuman believed that the Stock would be classified no higher than "B" [71] and probably "Caa." [72]

Based on his analysis he accepted the market price of $5⅜ per share for the Stock as its fair market value. Because the New Haven own 1,815,000 shares of this Stock, the estate's holdings amounted to $9,755,625.

*CBI*: These securities are not traded on a national securities exchange; as a result, volume figures are difficult to obtain. However, they are traded over-the-counter and bid prices are available. The average bid price of the CBI during the month of February 1979 was $12⅝ per $100 face value of a certificate.

Mr. Shuman determined that the CBI would be "unrated" or would be classified no higher than "C" [73] by *Moody's* and, upon comparison with other similar securities, he concluded that the average market price demonstrated fair market value, and that New Haven's ownership of $15,900,000 face amount of CBI was worth $2,007,375.

*Common Stock*: The Common Stock traded on a when-issued basis in the over-the-counter market through November 13, 1978, closing at $17¾. During the period November 14, 1978 through December 13, 1978, of when-issued trading on the New York Stock Exchange, it sold in the range of $19⅛ to $16¼. After regular trading started on December 14, 1978, it sold in the range of $18½ to $13⅜ through February 1979. In the latter month, 1,534,300 shares were traded.

Based on his studies, Mr. Shuman determined that the Common Stock should be valued at the market price of $17.50 per share for the following main reasons:

1) The market for the securities was seasoned, broad, free and orderly;

2) The quality and quantity of information was more than adequate for investors to make sound judgments concerning the value of the Common Stock, including appraisals of the range of recoveries in the Valuation Case;

70. Bonds rated Ba are judged to have speculative elements; their future cannot be considered as well assured. Often the protection of interest and principal payments may be very moderate and thereby not well safeguarded during both good and bad times over the future. Uncertainty of position characterizes bonds in this class.

71. Bonds which are rated B generally lack characteristics of the desirable investment. Assurance of interest and principal payments or of maintenance of other terms of the contract over any long period of time may be small.

72. Bonds which are rated Caa are of poor standing. Such issues may be in default or there may be present elements of danger with respect to principal or interest.

73. Bonds which are rated C are the lowest rated class of bonds and issues so rated can be regarded as having extremely poor prospects of ever attaining any real investment standing.

3) The market price reflects investors' valuations of the risks and rewards of the ADP and of the Penn Central's tax attributes; and

4) The hypothetical liquidation value of Penn Central would be $405.1 million resulting in a liquidation value of $17.50 per share of Common Stock.

Thus under Mr. Shuman's analyses, as of late February 1979, the fair market value of the New Haven's 1,370,203 shares of Common Stock was $23,978,552.

To further sustain the validity of the market value methodology, the First Mortgage Bondholders rely on the testimony of two additional experts, Mr. Martin J. Whitman, a professor at the Yale School of Organization and Management, and Mr. James J. Maguire, a registered specialist at the New York Stock Exchange in the trading of the Common Stock and Preference Stock of the Penn Central. Both men testified that the market was stable and orderly and that these securities were seasoned. Mr. Whitman further concluded that the market was an appropriate indicator of the values of the Penn Central securities.

In their brief, submitted months following Mr. Shuman's testimony, the First Mortgage Bondholders "update" their estimate of the net asset value of the New Haven available to satisfy their claim (after payment of senior claims) to reflect the later market prices for the securities during the period July 16, 1979 to August 15, 1979:

| Asset | Market Value Per Security | Total |
|---|---|---|
| Series A Bonds | $80.49/$100 [74] | $13,283,265 |
| Series B Bonds | $58.34/$100 | 4,375,500 |
| Preference B Stock | $ 5.65/share | 10,254,750 |
| CBI | $14.96/$100 | 2,378,640 |
| Common Stock | $18.75/share | 25,691,306 |

**74.** During the closing arguments, the First Mortgage Bondholders introduced tables to update the market prices of the various Penn Central securities held by the New Haven estate reflected in exhibits VI, XI, XIV, XVII and XIX of Mr. Shuman's affidavit. Using the table introduced to supplement exhibit VI, which

| | |
|---|---|
| Cash (as of 6/30/79) | 18,825,000 |
| The Net Asset Value Available to Satisfy First Mortgage Bondholders | $74,808,461 |

*The Income Bondholders' Methodology*

The Income Bondholders and their experts contend, as does the trustee and his experts, that intrinsic value rather than market price is the appropriate measure of value for the securities.

As explained by Mr. Walter Breslav, Jr., the Income Bondholders' lead expert, the market prices of the Penn Central securities must be assumed to be substantially below their intrinsic value for the following reasons: 1) the securities of a once-distressed company emerging from a lengthy reorganization are subject to substantial investor prejudice; 2) the market generally undervalues a litigated claim, such as the Valuation Case, as an asset; 3) the abilities of the management of Penn Central are as yet unproven; 4) holders of large numbers of the securities are banks and insurance companies which are under a "pressure" to sell the securities and, therefore cannot be considered to be "voluntary" sellers in the open market; and 5) investors do not possess sufficient knowledge concerning Penn Central's complex capital structure to appraise accurately the real value of its securities. *Amended Affidavit of Walter Breslav, Jr.,* dated March 29, 1979 at 5–15.

Mr. Breslav agreed with Mr. Dewey's valuations of the Penn Central securities and found them fair and accurate. He adopted Mr. Dewey's calculations and, with an adjustment made for the redemption of a portion of the Series A Bonds in 1978, he arrived at a valuation of $97.9 million as his

was the market prices of the Series A Bonds from Mar. 1, 1979 to Nov. 9, 1979, the average price of those bonds for the period July 16, 1979 to August 15, 1979 should have been $83.69/100. That would yield a total of $13,-812,350 as the value of the New Haven's Series A Bonds.

initial determination of the value of the securities. Mr. Dewey's assessments, however, assumed an $887 million base award in the Valuation Case, which was $113 million less than what Mr. Breslav expected as the minimum recovery. Mr. Breslav, therefore, concluded that $4.7 million more was available for the Common Stock, and that $102.6 million was the value of the Penn Central securities based on a minimum Valuation Case award of $1 billion.

Mr. Breslav used two different approaches in appraising the tax attributes for which he relied in part on the testimony of a tax expert, Mr. Samuel Braunstein. First, Mr. Breslav assumed that the IRS rulings that the transfer of the New Haven's rail assets to Penn Central in 1968 was nontaxable would be accepted by the management of the reorganized New Haven; and second, he considered the tax effects if the management of the reorganized New Haven did not follow the IRS rulings but treated the transfer of the New Haven's rail assets to Penn Central as a 1978 closed transaction and taxable.

Assuming an almost full utilization of the tax benefits available under the IRS rulings, Mr. Breslav calculated that net operating losses would be over $77 million and capital losses of over $100 million would exist. He calculated that the intrinsic value of these potential tax attributes was $47.8 million, after applying a 20% discount to allow for the possibility that the values could not be completely realized.

Based on the alternative assumption that the transfer of assets to Penn Central in 1968 was a taxable transaction giving rise to an ordinary loss deduction, he concluded that the intrinsic value of the tax attributes would be $56.2 million, after applying a 20% discount to the present gross value of $70.2 million for various uncertainties.

Mr. Breslav also testified that another quantifiable element of intrinsic value for the New Haven assets was the block value inherent in its holdings of approximately 6% of the Penn Central Common Stock. He was persuaded that a premium of at least $5.8 million, 10% over the value of the Common Stock as found by Mr. Dewey, would be paid if an acquirer sought to gain control over the reorganized Penn Central through the New Haven's large block of voting and equity ownership. With a 20% discount for risk applied, the net intrinsic value for the block premium is $4.6 million.

Mr. Breslav also considered the values attributable to the Common Stock from recoveries in the Valuation Case from $1 billion to $2.5 billion. He concluded that the discounted present value of the New Haven's share of these proceeds can range as high as $63.2 million.

Finally, Mr. Breslav recognized a real, but unquantifiable, value in terms of benefits that could be anticipated as a result of a merger of the reorganized New Haven with another corporation, such as providing a more effective and economical operation or combining assets to provide a strong capital base for future developments.

The Income Bondholders also rely on the evidence presented by Mr. Peter C. Morse, a financial expert. Mr. Morse discussed the various effects upon the two system bondholders under the various plans of reorganization before the Court. He testified that in his view the reorganization value of the New Haven is in the range of $174.5 million to $246 million, that the trustee's Amended Plan was not fair and equitable, and that the Income Bondholders' proposed plan of reorganization was the only one feasible and equitable.

## B. THE COURT'S RULINGS ON VALUATION

The disputed issues of fact and law relating to the applicable methodology for the valuation of the assets of the New Haven have been fully litigated in a trial on the merits. The validity of every opinion expressed on the subject was contested to the minutest detail. After a careful review and consideration of the extensive evidence and voluminous briefs, the Court is of the opinion that no party's valuation procedures can be accepted *in toto* as the basis for a fair, equitable and feasible plan of reorganization.

■ In determining the value of the New Haven estate for reorganization purposes, the Court will consider and value each of the categories of assets considered by the parties and their experts: 1) cash and cash equivalents; 2) the Penn Central securities; and 3) various intangibles, such as tax attributes and block premiums, which are inherent in the reorganized New Haven.

*Cash* : At the present time the cash held by the trustee is $36.7 million. It is reasonable to expect favorable consideration of the trustee's claim for $2.15 million for reimbursement for attorneys' fees and expenses paid by him in the Penn Central reorganization proceedings. The Court, therefore, will treat the amount of this claim as a cash equivalent asset of the estate.

*The Securities* : The fair market value concept has a definite facial attraction. Its application results in precise calculations, mathematically ascertained, which are not only expressible in monetary terms but are realizable in actual dollars at the present time. Such exact measurement of the worth of New Haven's securities would have the ostensible imprimatur of the scientific method and would evoke a sense of definitiveness to these proceedings. Finality certainly would be welcomed after 18 years of uncertainty and of protracted, complicated, and expensive litigation. But, however tempting the easier route to resolution may be, the Court finds that it cannot equate ease with equity nor fairness with fair market value.

■ This is not to say that the market prices of the securities are to be ignored or summarily dismissed as irrelevant. The design of a fair and equitable plan of reorganization first necessitates a valuation of the assets of the New Haven to ensure that the distribution of the securities of the reorganized New Haven will conform to the abso-

lute priority rule. See, e. g., *TMT Trailer,* supra, 390 U.S. at 448–50, 88 S.Ct. at 1175–76; *Consolidated Rock,* supra, 312 U.S. at 527, 61 S.Ct. at 685; *Case v. Los Angeles Lumber Products Co.,* supra, 308 U.S. at 115–19, 60 S.Ct. at 7–9; 6A *Collier,* supra, § 11.06. Obviously, if the Court errs by not accepting the market value approach advocated by the First Mortgage Bondholders, they will, indeed, receive less on distribution than their entitlement. On the other hand, a wooden application of the market price methodology, if erroneous, would deprive the Income Bondholders of a position of equity, rightfully theirs, in the reorganized New Haven.

Though significantly different in theory and by definition,[75] the Court does not view the market price and intrinsic value methodologies to be necessarily antithetical, irreconcilable approaches to valuation. If the investing public is well informed, and the securities are seasoned and trading actively in a stable market, it seems apparent that market price should approximate the intrinsic value of the securities. If so, the marketplace should be the principal, if not the exclusive, indicator of value. However, the presence of special circumstances, which would unduly distort the investors' appraisals of the fair and real value of the securities, requires that the trier assess criteria other than market prices to gauge the worth of an enterprise for reorganization purposes.

These legal principles are not antagonistic to the standards enunciated in the case authorities heavily relied on by the First Mortgage Bondholders. In *E. I. duPont de Nemours & Co. v. Collins,* supra, the Supreme Court accepted the SEC's valuations in a merger case based on market value, but only after expressly noting that the transaction involved "an exchange of equivalents," 432 U.S. at 51, 97 S.Ct. at 2232, and that the value of the securities being sur-

---

**75.** Fair market value has been generally defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.

Intrinsic value, as it has been used in these proceedings with respect to securities, is that value which is justified by the facts, including assets, earnings and dividends, capitalized earnings and discounted cash flow.

rendered was basically their "real value." *Id.* at 54, 97 S.Ct. at 2234. The Second Circuit in *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, supra, stressed that in a takeover situation the market value approach was the appropriate measure of "going concern" value, "*absent compelling reasons to believe otherwise.*" 600 F.2d at 361 (emphasis added). Similarly, in *Mills v. Electric Auto-Lite Co.*, supra, the court asserted that "when market value is available and *reliable*," it should be used to assess the value of ongoing enterprises in the context of a merger. 552 F.2d at 1247 (emphasis added). The holding in *In re Equity Funding Corp.*, supra, also confirms that market value is the appropriate measure of assets for reorganization purposes if it adequately recognizes "relevant risks and market factors." 416 F.Supp. at 144. Finally, the market price test was approved as the fundamental valuation criterion "in the absence of special circumstances" in *Central States Elec. Corp. v. Austrian*, supra, 183 F.2d at 884.[76]

In the instant case, the Court finds that the market in general is somewhat unsettled because of the social, political, and economic stresses current on the domestic and international scenes. Yet, it is neither in disarray nor in a panic state which in and of itself would warrant a rejection of the investors' perceptions of the value of securities. More specifically, the transactions involving Penn Central securities during the past year have been in a volume ample to indicate steady and positive investors' interest.

On balance, however, there are sufficient features, peculiar to the securities held by the New Haven, which sustain the conclusion that the market has underrated these securities, and will continue to do so for some time in the future. The stigma of bankruptcy alone is a factor that will seriously depress the market value of a compa-

ny's securities. In its discussion of the contention that the market can be expected irrationally to undervalue the securities of a company emerging from a lengthy reorganization, the Third Circuit stated:

> That argument has considerable force when the securities in issue represent equity in, or long term interest bearing obligations of, a reorganized debtor. In such cases, the market value of the security will depend upon the investing public's perception of the future prospects of the enterprise. That perception may well be unduly distorted by the recently concluded reorganization and the prospect of lean years for the enterprise in the immediate future. Use of a substitute "reorganization value" may under the circumstances be the only fair means of determining the value of the securities distributed.

*In re Penn Central Transportation Co.*, supra, 596 F.2d at 1115–16; see also *In re Missouri Pacific R.R.*, 39 F.Supp. 436, 445–6 (E.D.Mo.1941).

In addition, it is reasonable to assume that much more time is necessary for the marketplace to absorb, digest and react rationally to the available information concerning the Asset Disposition Program, the Valuation Case, and the complex capital structure of the Penn Central with its tiers of securities, cascades, lien priorities and the utilization of tax losses. It is evident that traditional methods employed by investors in valuing securities cannot be readily applied to the securities in question. As pointed out by Judge Fullam: "The actual dollar value of the [Penn Central] securities . . . could not be fixed with even the minimal degree of precision encountered in ordinary reorganization plans until the Valuation Case litigation is concluded." 458 F.Supp. at 1301; see also *In re New York, N.H. & H.R.R.*, supra, 304 F.Supp. at 809.

---

**76.** It is significant to point out that Mr. Shuman's testimony indicated that his analysis would not support the conclusion that at a future point in time one could simply refer to the market quotations to determine the value of the New Haven's holdings of Penn Central se-

curities. He pointed out that the full analysis, including comparisons of comparable companies, would have to be made before one could justify reliance on market prices for valuing these securities.

The valuation methodology for the securities held by the New Haven requires an assessment of the two principal aspects of the Penn Central's discontinued businesses: the ADP and the Valuation Case.

As previously stated, the ADP provides for the orderly liquidation of certain of the assets of Penn Central during the 11-year period from January 1, 1977 through December 31, 1987. It contemplates a steady cash flow to the company for the retirement of specific securities on a schedule set forth by the Penn Central trustees in their plan of reorganization.

At the outset the assets to be liquidated under the ADP consisted of real estate, rail lines, coal lands, and investments. The real estate holdings included substantial prime properties in New York City, over 2,000 acres of underdeveloped land in or near major cities, and approximately 5,000 parcels totaling 75,000 acres of land in 16 states. Rail lines for sale involved about 1,170 route miles over 1,220 track miles of rail segments and 228,000 gross tons of rail. Coal lands included 258,000 acres on which lease and royalty payments were to be received from third parties.

In the Penn Central reorganization proceedings, the SEC studied the evidence relating to the ADP and concluded that the forecasts concerning the amounts and timing of the sales of the assets were "realistic." Judge Fullam described the ADP as "very detailed and carefully constructed," and expressed the opinion that there is a "reasonable certainty" of its success. 458 F.Supp. at 1255. On review of the Penn Central plan of reorganization, the Third Circuit exhibited no reluctance in accepting the ADP as a viable project for the redemption of the debt securities as scheduled under the projections advanced by the Penn Central trustees. See, e. g., 596 F.2d at 1108 and 1122. To date the payments to the New Haven of its share of ADP proceeds have been timely and within predicta-

ble levels.[77] Therefore, the Court deems it appropriate to accept the ADP as a valid premise for valuation purposes.

The most difficult and delicate aspect of the valuation process concerns the Valuation Case and its relationship to a fair assessment of the worth of the securities. The only safe assumption that can be made is that the Penn Central will receive just compensation for the assets it transferred to Conrail, and that the recovery, as even the First Mortgage Bondholders agree, will be "large." *FB Reply Brief* at 89. But this is merely the starting point in the inquiry.

The amount of the award and the timing of its receipt are prerequisite premises to an informed conclusion regarding the value of the Penn Central securities which are dependent on the Valuation Case for payment. At the present time, these crucial components are not known or knowable through any information that has been made public on the status of the case. For any person to predict the ultimate outcome of the case with mathematical precision would be folly; for this Court to do so would also be a presumptuous intrusion into that which is within the exclusive jurisdiction of the Special Court.

Yet, in weighing the salient elements involved in the valuation of the securities, it is essential that the Valuation Case be placed on the scales for consideration. Neither its existence nor its consequences can be pretermitted. Both Judge Fullam and the Third Circuit deemed a review of the risks and potential benefits of the Valuation Case indispensable to their analyses of the valuation of the Penn Central securities which were to be distributed to creditors. See 458 F.Supp. 1254, 1262, 1270–76; 596 F.2d at 1117, 1138, and 1164–65. This Court's *de novo* evaluation of the worth of a portion of the same securities in these proceedings must necessarily include an appraisal of the Valuation Case.

---

77. As of Dec. 31, 1978, $12,297,000 principal amount of the New Haven's holdings of Series A Bonds had been redeemed, and by Dec. 31, 1979, an additional $8,946,000 had been redeemed. This total of $21,243,000 is somewhat ahead of the redemption predictions based on the Penn Central cash flow forecasts.

Judge Fullam calculated that a Valuation Case base award of approximately $887 million was required to retire all the Penn Central securities senior to the Common Stock. Obviously, a base recovery substantially in excess of that figure would be necessary for those creditors participating in the plan to be compensated fully. Judge Fullam concluded that the "reasonable range of litigation possibilities" in the Valuation Case was broad enough to encompass all creditors, and he approved the plan as fair, equitable and feasible. On appeal, the Third Circuit accepted his findings and affirmed his decision on this issue. 596 F.2d 1165–66.

It must be acknowledged, of course, that these judicial valuation assessments of the securities, which are linked to the outcome of the Valuation Case, were not intended to indicate the opinions of those courts as to what a satisfactory result in the case should be. See, e. g., 458 F.Supp. at 1274. It is clear that the recovery in the Valuation Case will be based solely on the proven facts and controlling law, without regard to the assumptions made by the Penn Central reorganization court or, for that matter, those made by this Court, as to the amount of that award.

It is important to note, however, that the Special Court has labeled the initial offer of $506.5 million for the rail properties conveyed to Conrail to be so low that it is "incredible" and "unbelievable." 445 F.Supp. at 1029. In monetary terms, the "beauty" to be found in those characterizations is in the eye of the beholder. The experts of the trustee and the Income Bondholders believe that the base award will fall in the range of $1 billion and $2.5 billion. The First Mortgage Bondholders' expert did not estimate a probable award, but thought that it was "unlikely" that the proceeds would be substantially in excess of the amount required to redeem the CBI.

This Court has carefully reviewed the ground rules and legal principles established by the Special Court to guide the

parties on the issues in the Valuation Case, the estimates of value relied on by Judge Fullam and the Third Circuit, and the evidence submitted on the question by the parties in this case. For the purposes of valuing the securities held by the New Haven and the allocation of the securities of the reorganized New Haven under the absolute priority rule, the Court is persuaded that, within a reasonable degree of probability, the Valuation Case base award will be between $1 billion to $1.5 billion.

The Court will value the New Haven securities as of February 1, 1980, a suitable date for the cutoff of mathematical calculations and one that closely parallels the effective date of the plan of reorganization.

With respect to the debt securities (Series A and B Bonds, the Preference Stock [78] and CBI), the Court finds that the most appropriate method of valuation is to compute the present value of the cash flow likely to be generated from such of the New Haven's holdings of these securities as are to be paid off or redeemed.

*Series A Bonds:* In accordance with the Penn Central plan of reorganization, the New Haven received $28.8 million principal amount of Series A Bonds. To date, the total amount redeemed is $21,243,000, leaving a face amount of $7,557,000, which is scheduled for payment prior to 1984. Both Judge Fullam and the Third Circuit anticipate that redemption of these Bonds out of proceeds from the ADP will be easy, prompt and certain. 596 F.2d at 1122; 458 F.Supp. at 1258. This Court agrees, and deems it reasonable to discount the remaining principal balance from 1984 at 8%, a rate consistent with high grade debt obligations, and determines their present value is $5,590,359, exclusive of any interest that might accrue between April 1, 1981 and the date the Bonds are fully redeemed.

*Series B Bonds:* The New Haven received $7.5 million principal amount of Series B Bonds under the Penn Central Plan of Reorganization. Cash flow predictions

---

**78.** Because of the redemption features of the preference stock, the various experts have treated them throughout these proceedings as a debt security, and the court will do likewise.

indicate that a portion of the Bonds will be retired and most of the interest on them will be paid through 1987. 596 F.2d at 1108. The balance outstanding on December 31, 1987 is to be paid out of proceeds from the Valuation Case. A base value recovery of only $527.4 million would be sufficient to retire all the Series B Bonds, with virtually no risk factor involved so that an 8% discount rate would be appropriate.

Therefore, the Court places a present value of $6,456,891 on the New Haven's holdings of Series B Bonds.

*Preference Stock:* The New Haven's share of Series B Preference Stock has a redemption value of $36.3 million. This Stock has the following redemption features:

> Beginning in 1981, annual redemption of 5% of the preference stock at $20 per share is required if an income test is met. If the income test is met but cash is not available, the redemption obligation carries over. The cash forecast does not indicate that any preference stock will be redeemed. However, the forecast does show that the income test would permit redemption of $25.3 million of preference stock in 1981. Since no estimate of Pennco's earnings past 1981 is available, additional redemptions cannot be predicted. Unredeemed preference stock will have a claim against the proceeds of the Valuation Case subordinate to the Series B, C, and D notes and the Series B bonds. If the Valuation Case proceeds are not adequate to redeem the preference stock, preference stock automatically converts to common at a ratio of 1 share of common for each 6.5 of preference.[79]

It appears that a base recovery of $798.3 million from the Valuation Case will discharge all the Preference Stock. While there is a high probability that the Stock will be retired as projected, it must still be regarded as a more speculative security and, therefore, the Court finds it appropriate to discount the redemption value at 10% from December 31, 1987 to February 1, 1980, fairly to estimate the present value of this Stock at $17,069,254.

*CBI:* The New Haven owns CBI having a liquidation value of $15.9 million, but payable only out of Valuation Case proceeds. It is estimated that a base recovery of $887.4 million will be required to cover these securities. CBI are junior to the Preference Stock, and a discount rate of 12% should be applied to compute their present value which the Court finds is $6,482,678.

*Common Stock:* While the matter is not free from doubt, the Court is persuaded by a preponderance of the evidence that the Common Stock, of which the New Haven owns approximately 6%, may be best valued by a study of two components: 1) an appraisal of Penn Central, and 2) a recognition of a probable spillover from the Valuation Case. In the light of the applicable legal principles, the evidence leaves little room for any viable alternative approach to value.

The testimony established that the value of the continuing business of the reorganized Penn Central, as of December 31, 1978, was $969 million. It is reasonable to assume that Penn Central's value has appreciated during the past year, particularly in view of the recent merger with Marathon Manufacturing Company, the purchase of the minority interest in both Edgington and Great Southwest, as well as the acquisition of Williams Energy. The passage of time and the recent acquisitions warrant an additional value which, on the state of the present record, cannot be quantified.

Countervailing testimony tended to indicate that the ongoing businesses were overvalued by "double counting" of Penn Central's tax shelters of Pennco earnings with respect to Buckeye ($79.2 million) and Clearfield ($4.1 million), and by improper discounting of ADP assets with respect to coal royalties in the amount of $4,484,000. While there was no proof, in the legal sense, that such discrepancies did occur in the valuation methodology, the Court, in excess

79. *In re Penn Central Transportation Co.*, supra note 5, 458 F.Supp. at 1259.

of caution, will adjust Penn Central's valuation to $881.2 million.

The second element that must be taken into account is the Valuation Case's spillover value and its impact upon the Common Stock. In the Court's opinion, a base award of $1.2 billion is a useful and prudent estimate for the purposes of this case, and one well within the range of probable recoveries. With compound interest at 8% to December 31, 1987,[80] the proceeds would be $2,964.2 million. From this must be subtracted $2,191.9 million to retire the senior securities, leaving $772.3 million as spillover. The discounted value of this amount [81] to present date is $277.1 million.

Thus, the two components utilized to value the Common Stock aggregate $1158.3 million. On the basis of the New Haven's percentage of the ownership of these securities, the value of the Common Stock held by the New Haven is $69.5 million.

*Intangibles:* In addition to the asset values set forth above, there are several intangible elements of value, such as the tax benefits, block premium, and merger possibilities.

The tax attributes are the most important of these assets. Quantification of the New Haven's tax characteristics is admittedly complex and difficult, but that does not justify, in the Court's view, giving them a "zero" valuation. They do, in fact, exist; even a modicum of prudence and competence in management of the reorganized New Haven should result in impressive tax savings of substantial value to the new company and its shareholders. At trial the assessments of the worth of these tax benefits ranged from $12 million to $70.2 million. While the Court is confident that skilled and resourceful directors will guide the fortunes of the reorganized New Haven

and that sound business acumen will be exercised to take advantage of as many of the tax savings as possible, the Court will assign a minimum value of $12 million to the tax characteristics of the New Haven. It is anticipated, however, that this estimate will prove conservative in future years.

Finally, although the block holding of Common Stock and the New Haven's attraction as a target for merger are valuation "pluses," even a sparing appraisal of their worth would be based on surmise and conjecture; therefore, no attempt to quantify their value will be made.

The Court is well aware that its valuation methodology, depending as it does on the long term performance of the ADP and the risks and potential benefits of the Valuation Case, is necessarily laced with uncertainties. Yet, because of the lack of precise precedent, the unique facts here, and the legal principles deemed applicable, the Court is convinced its overall approach to valuation is sound, reasonable, and fair. However, it is also clear that several of the salient computations have built-in vulnerabilities. These include the assumptions that 1) the enhancement of the Common Stock by the spillover from the Valuation Case will filter down to increase the value of the securities on a dollar-for-dollar basis;[82] and 2) the discount rates applied throughout the appraisal process are accurate to the percentage point utilized.

Under all the circumstances, the Court will make an adjustment of $6.5 million in the valuation of the assets of the New Haven to provide a cushion against a possible future adverse impact due to the inherent contingencies in the methodology and, therefore, fixes the present value at $149.5 million.

---

80. For purposes of this opinion, this Court, as did Judge Fullam, will assume that the Valuation Case will not be settled. See *In re Penn Central Transportation Co.*, supra note 5, 458 F.Supp. at 1274, n. 40.

81. See note 51, supra.

82. See, e. g., *In re Penn Central Transportation Co.*, supra note 5, 458 F.Supp. at 1276. In this regard, it is interesting to note that for every reduction of $16.7 million in the discounted spillover, the valuation of the New Haven's assets is decreased by about $1 million. Thus, if the discounted spillover were diminished by 20%, it would only reduce the appraisal of the estate by less than $3.4 million.

## C. THE COURT'S RULINGS ON CLAIMS

The only issue with respect to the First Mortgage Bondholders' claim against the New Haven estate concerns the amount of interest that will be allowed on the principal due these bondholders. All the parties agree that interest commences on January 1, 1961, but the method of its computation, its termination date, and the form of its payment are all in dispute.[83]

In 1969 Judge Anderson ruled that the first system bondholders were entitled to interest until the effective date of the plan of reorganization which, under the plan filed at that time, was December 2, 1968. 304 F.Supp. at 1132–33. He expressly rejected the contention that interest should run to the date of consummation of the plan, i. e., the date of payment, stating:

> As to the accrual of interest beyond the effective date of the Plan, the contention would have more merit if this were a conventional reorganization of a railroad which operated profitably and produced net income before fixed charges. But this is not such a reorganization. To paraphrase Lord Hardwicke who likened a bankruptcy to a shipwreck, this reorganization is like a total trainwreck; and applying equitable principles vis-a-vis the two system mortgages, the court is of the opinion that the Plan strikes a fair balance when it terminates the accrual of interest on the first system mortgage at the effective date of the Plan.[17]

*Id.* In footnote 17, Judge Anderson discussed the "excellent authority" for his ruling: *R. F. C. v. Denver & R. G. W. R. R.,* 328 U.S. 495, 521, 66 S.Ct. 1282, 1296, 90 L.Ed. 1400 (1946); *Ecker v. Western Pacific R. R.,* supra, 318 U.S. at 509, 63 S.Ct. at 724; *Institutional Investors,* supra, 318 U.S. at 546, 63 S.Ct. at 740. Judge Anderson also ordered that these bondholders receive one class of stock for both principal and accrued interest. 304 F.Supp. at 1133.

In the instant proceedings, the trustee, in conformity with Judge Anderson's opinion, proposes that interest on the First Mortgage Bonds runs to the effective date of the plan. However, he deviates from the ruling by recommending that the interest be satisfied by the issuance of New Common Stock rather than by the Class A Common Stock of the reorganized New Haven, the form of payment designated to compensate the First Mortgage Bondholders for the principal amount of their claim.

Both the First Mortgage Bondholders and the Income Bondholders object to the trustee's proposals. The First Mortgage Bondholders contend that: 1) interest should accrue until the date of payment, i. e., the consummation date of the plan; 2) interest on interest should be allowed; and 3) the interest should be satisfied in the same manner as the principal. The Income Bondholders agree that one class of stock should issue to compensate the First Mortgage Bondholders for both principal and interest, but argue that the cutoff date for the interest portion of the claim be set at December 2, 1968.

No useful purpose is served by reiterating here Judge Anderson's comprehensive review of the law and his reasoned conclusions with respect to the allowance of interest on creditors' claims in these proceedings. In this Court's opinion, they have been established as the law of this case. See, e. g., *Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 135 (2 Cir.), *appeal dismissed,* 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956); 1B *Moore's Federal Practice,* ¶ 0.404[10] at 573–74. Even if the questions were still open, the Court is convinced that no cogent reasons in law or in fact have been advanced to warrant a departure from Judge Anderson's adjudications.

The general rule is that post-petition interest is not allowable in ordinary bank-

---

**83.** Throughout the course of these proceedings, Regina Gruss, a holder of a substantial number of First Mortgage Bonds, was independently represented by counsel. She relied on the testimony introduced by the trustee for the class of First Mortgage Bondholders on the issue of the value of the New Haven estate, but chose to file her own brief regarding the Amended Plan, with particular emphasis on the question of allowing "interest on interest" on the claim of the First Mortgage Bondholders.

ruptcies and reorganizations. The main reasons advanced for this principle are that the date the petition is filed conveniently "fixes the moment when the affairs of the bankrupt are supposed to be wound up," *Sexton v. Dreyfus*, 219 U.S. 339, 344, 31 S.Ct. 256, 257, 55 L.Ed. 244 (1911), and that "creditors should not be disadvantaged vis-a-vis one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws." *Nicholas v. United States*, 384 U.S. 678, 683, 86 S.Ct. 1674, 1679, 16 L.Ed.2d 853 (1966) (footnote omitted); see also *City of New York v. Saper*, 336 U.S. 328, 330, 69 S.Ct. 554, 555, 93 L.Ed. 710 (1949); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) ("*Vanston*"); *In re Kingsboro Mortgage Corp.*, 514 F.2d 400, 401 (2 Cir. 1975).

There are, however, two notable exceptions to the general rule in situations where: 1) the bankrupt ultimately proves to be solvent; and 2) the claimant's security itself produces income after the filing of the petition, in which case the post-bankruptcy income can be applied against post-bankruptcy interest on the main claim. *In re Kerber Packing Co.*, 276 F.2d 245, 246 (7 Cir. 1960); *In re New York, N. H. & H. R. R.*, supra, 304 F.Supp. at 1129–30; see also *City of New York v. Saper*, supra, 336 U.S. at 330, 69 S.Ct. at 555.

■ Thus, if the bankrupt is solvent and there is a surplus after payment of all claims, creditors should receive interest on their interest-bearing claims rather than having the surplus turned over to the debtor. Similarly, if the security itself yields income during the bankruptcy period, the creditors should be allowed to apply the income derived from the security to the payment of interest accruing on their claims. In both cases, the allowance of post-bankruptcy interest does not diminish the share of the bankrupt's assets which is to be distributed to the remaining creditors. *United States v. Harrington*, 269 F.2d 719, 722–23 (4 Cir. 1959).

Neither of these two exceptions is applicable to this case. The first may be disposed of quickly: it is uncontroverted that the New Haven estate is hopelessly insolvent. The second is inapposite for either one or both of the following reasons: 1) the assets of the New Haven, over the bankruptcy period as a whole, have not produced net income; and 2) no testimony was adduced, nor argument advanced, that any net income that may have been earned sporadically during any of the many years of this bankruptcy is a valid measurement for the allowance of interest on the First Mortgage Bonds.

A third exception has also been accorded general acceptance in American bankruptcy law. Despite the strong reasons against allowing post-bankruptcy interest, there are special instances where the courts have awarded interest on a fully secured claim if the value of the security exceeds the principal and interest due. *Vanston*, supra, 329 U.S. at 164, 67 S.Ct. at 240; *United States v. Bass*, 271 F.2d 129, 130–31 (9 Cir. 1959); *In re Macomb Trailer Coach, Inc.*, 200 F.2d 611, 613 (6 Cir.), cert. denied sub nom. *McInnis v. Weeks*, 345 U.S. 958, 73 S.Ct. 940, 97 L.Ed. 1378 (1953); see generally Annot., 27 A.L.R.2d 586 (1953). The majority of courts have restrictively applied this exception, rejecting its applicability to tax claims, e. g., *United States v. Bass*, supra, 271 F.2d at 131; *Sword Line, Inc. v. Industrial Commissioner*, 212 F.2d 865, 868 (2 Cir.), cert. denied, 348 U.S. 830, 75 S.Ct. 53, 99 L.Ed. 654 (1954); *contra, In re Parchem*, 166 F.Supp. 724, 729–30 (D.Minn.1958), but utilizing it to award interest on mortgages, bonds secured by collateral, or a vendor's lien on a particular chattel, *see cases collected in United States v. Harrington*, supra, 269 F.2d at 724, n. 7.

■ Because the exception provides for payment from assets which would normally go to remaining creditors, equitable considerations must be invoked to ensure that the allowance of interest in fairness to the senior creditors does not unduly prejudice the subordinate creditors by an unwarranted depletion of the assets of the estate. As the Supreme Court cautioned in *Vanston* :

It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor.

329 U.S. at 165, 67 S.Ct. at 241.

In the instant case, the First Mortgage Bondholders seek over $80 million in interest, an amount well in excess of their principal. In considering their claim for interest, the Court at the outset declines to award "interest on interest" under the principles set forth in *Vanston*, supra, 329 U.S. at 166–67, 67 S.Ct. at 241–42. See also *In re Inland Gas Corp.*, 187 F.2d 813, 819 (6 Cir. 1951); *Empire Trust Co. v. Equitable Office Building Corp.*, 167 F.2d 346 (2 Cir. 1948).

The Court is persuaded, however, that interest at the contract rate should be extended on the First Mortgage Bonds until February 29, 1980, the last day of the month in which the effective date of the plan occurs. Substantial equity requires that the First Mortgage Bondholders receive additional compensation for the significant improvement in the financial position of the estate since 1968, primarily due to investments and cash settlements of various claims. In large measure, the estate has benefited at the expense of the First Mortgage Bondholders and, therefore, an accrual of interest as herein provided is consistent with equitable principles.

The Court is convinced that the last day of the month in which the effective date of the plan occurs provides a fair, equitable and expedient time for the calculation of the interest claim of the First Mortgage Bondholders. The valuation of the New Haven estate and the distribution of the securities of the reorganized New Haven are keyed to this month. Fixing the rights of the parties as to amounts of payments to be made for their claims, including principal and interest, in direct relationship to the schedule of distribution for the new securities is practical and appropriate. Furthermore, February 29, 1980 is the date beyond which this Court deems the accrual of interest would deplete the assets of the estate unreasonably and inequitably to the detriment of subordinate creditors. Finally, contrary to the contention of the First Mortgage Bondholders, the selection of this date for the termination of interest does not offend the absolute priority rule. That rule controls the *payment* of allowable interest, not the determination of what interest is allowable.[84]

In sum, for these reasons and those advanced by Judge Anderson,[85] this Court is persuaded that the cutoff of interest as set forth above "strikes a fair balance." 304 F.Supp. at 1133.

With respect to the Income Bondholders' claim for interest, the issue is obviously academic. Only if the value of the New Haven's assets were in excess of $195 million would interest on the Income Bonds be a relevant issue.

Accordingly, the Court concludes that the allowable claim of the First Mortgage Bondholders is a total of $135,715,151, consisting of $76,819,900 principal and $58,895,251 interest, and that the allowable claim of the Income Bondholders is $8,784,849, the balance of the present value of the New Haven estate after satisfaction of the allowed portion of the claim of the First Mortgage Bondholders and an allowance of a reserve for claims senior to them.

---

84. As Judge Anderson pointed out, 304 F.Supp. at 1129, note 7:

The fact that a claim for post-bankruptcy interest may not be allowable merely means that it does not share in the distribution of the estate. It does not mean that the claim is invalid.

85. In their brief, at 134–35, the First Mortgage Bondholders argue that because the trustee's reports disclose "income before fixed charges"

in 1978 and 1979 of close to $2 million, Judge Anderson's 1969 ruling is no longer relevant. Obviously, however, these facts do not meet Judge Anderson's test of a "profitable" operation; the estate was in 1969 and is today incurably insolvent. In any event, the production of several millions of dollars in income since 1969 falls far short of the numerous millions of dollars in interest requested by the First Mortgage Bondholders.

## D. DISTRIBUTION

For the legal and factual reasons hereinbefore detailed, the Court finds that its valuation methodology yields a result which is reasonably and fairly commensurate with the going concern value of the reorganized New Haven. Thus, with the allowable claims also having been determined, the criteria are now available to establish an appropriate and feasible allocation of the securities of the reorganized company between the two system mortgage bondholders in accordance with the absolute priority rule.

■ In this Court's opinion, the following distribution of the securities of the reorganized New Haven represents compensation which is fairly and equitably equivalent to the value of the claims and rights surrendered by the First Mortgage Bondholders and the Income Bondholders:

1) The reorganized New Haven shall have an equity capitalization consisting of one class of common stock.[86]

2) The First Mortgage Bondholders shall receive one share of Common Stock of the reorganized New Haven for each $10 of the $135,715,151 allowed portion of their claim, *pro rata.* Any fractional shares shall be paid in cash at the time of distribution.

3) The Income Bondholders shall receive one share of Common Stock of the reorganized New Haven for each $10 of the $8,784,849 allowed portion of their claim, *pro rata.* Any fractional shares also shall be paid in cash upon distribution.

Parenthetically, it is interesting to note that this result has a striking sensibility when viewed in the context of the estate's treatment under the Penn Central plan of reorganization. Under that plan, the New Haven estate received securities which were fairly commensurate with the allowed portion of its claim, or $174 million. *In re New York, N. H. & H. R. R.,* No. 30226 (D.Conn. May 1, 1978) (Findings of Fact and Conclu-

sions of Law in Connection with Petition for Order No. 850, Anderson, J.). Of that, $121 million was fully secured as of the time of distribution; $53 million was unsecured and would only have a present value which took into account the exigencies of the Valuation Case. If that $53 million were treated in a similar manner as the Court has treated the securities that rely on the Valuation Case for payment, that is, discounted from the predicted payment date, December 31, 1987, at 13.8%, a rate that reflects these exigencies,[87] it would result in a value of $19 million as of February 1, 1980. The secured portion and the present value of the unsecured portion would thus total $140 million, an amount which, when a reasonable value is added to reflect the intangibles inhering to the reorganized New Haven, parallels remarkably the valuation computation relied on by this Court.

## CONCLUSIONS

In conformity with the views expressed, the Court finds that:

1. The claims junior to Class H have no value and no equity in the reorganized New Haven;

2. The New Haven estate is insolvent; and

3. The plan of reorganization as structured by the Court is fair, equitable, and feasible.

## IV. RESERVATION OF JURISDICTION

The Court reserves jurisdiction to consider and act upon any and all matters lawfully brought before it with respect to the New Haven estate, the reorganized New Haven, and the plan of reorganization.

The parties shall meet with the Court in Chambers on March 4, 1980, at 11 A.M., at which time they will present to the Court an appropriate form of Order to be entered in conformity with this Opinion.

---

**86.** The issuance of one class of securities is less complicated than the trustee's two-class structure and, as Judge Anderson observed, 304 F.Supp. at 1133, provides an allocation to the First Mortgage Bondholders which is "more nearly in keeping with the absolute priority rule."

**87.** See note 51, supra.

## SUPPLEMENTAL OPINION ON THE CONSENSUAL PLAN

On February 14, 1980, this Court rendered its decision on the distribution of assets and the provisions to be included in a fair, equitable and feasible plan of reorganization for the bankrupt New York, New Haven and Hartford Railroad. *In re New York, N. H. & H. R. R.,* 4 B.R. 758 (D. Conn.1980).

The decision required that all the parties to the proceedings meet with the Court in Chambers on March 4, 1980, at 11:00 A.M., to present an appropriate form of order to be entered in conformity with the decision. *Id.* at 800.

At the meeting of March 4th, the parties advised the Court that they had agreed to a consensual plan for the reorganization of the New Haven which would be a slight modification to the plan described in the Court's decision, and that they were all prepared to urge the Court to approve their revised plan.

Accordingly, the Court ordered that due notice be given to all interested persons of the proposed revised plan, both by direct notice to the interested persons known to the various representatives of claimants and by publication, and set April 10, 1980 as the date on which a hearing would be held on the revised plan. *Id.* (March 14, 1980) (Order of Notice).

On April 10, 1980, a hearing was held at which the trustee of the New Haven estate testified as to the provisions of the revised plan. All the parties and interested persons were given the opportunity both to cross-examine the trustee and to be heard on the merits of the revised plan.

The Court found that: 1) the distribution under the revised plan was not a substantial or material deviation from the distribution provided for in the Court's decision, 2) that the delay and expense associated with appeals and cross-appeals by the parties would be avoided by approval of the revised plan, and 3) that the "cash buy-out" provision of the revised plan would not deplete the assets of the estate or the reorganized company nor would it affect the capitalization of the reorganized company.

Based on the facts found by the Court, the moving papers, the testimony of the trustee, the representations of all counsel for the parties, and for the reasons stated in open court at the hearing, the Court finds that under the circumstances, the revised plan is fair, equitable and feasible and approves it as submitted.